No. 24-1229

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

———————————

JW ALUMINUM COMPANY,

*Plaintiff-Appellant*,

v.

ACE AMERICAN INSURANCE COMPANY; WESTPORT INSURANCE CORPORATION;
AIG SPECIALTY INSURANCE COMPANY; AND GENERAL SECURITY INDEMNITY
COMPANY OF ARIZONA,

*Defendants-Appellees*.

———————————

On Appeal from the United States District Court for the
District of South Carolina at Charleston, No. 2:21-cv-01034-BHH

———————————

## REDACTED OPENING BRIEF OF PLAINTIFF-APPELLANT

———————————

BEATTIE B. ASHMORE
650 East Washington Street
Greenville, SC 29601
(864) 467-1001
Beattie@BeattieAshmore.com

CRAIG A. BONEAU
*Counsel of Record*
SCOTT D. SALDAÑA
DYLAN E. JONES
MORGAN M. MENCHACA
JULIA L. DI FIORE
REID COLLINS & TSAI LLP
1301 S. Capital of Texas Hwy, Ste. C300
Austin, TX 78746
(512) 647-6100
cboneau@reidcollins.com

*Counsel for Plaintiff-Appellant*

June 4, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Appellant JW Aluminum Company certifies that it is a wholly owned subsidiary of JW Aluminum Continuous Cast Company, which is a wholly owned subsidiary of JW Aluminum Holding Corporation.

**Page**

TABLE OF AUTHORITIES ............................................................................iv

INTRODUCTION ..........................................................................................1

JURISDICTIONAL STATEMENT ...............................................................1

STATEMENT OF THE ISSUE......................................................................2

STATEMENT OF THE CASE........................................................................3

    A.    Relevant Facts ................................................................................3

    B.    Procedural History..........................................................................5

SUMMARY OF ARGUMENT ......................................................................6

ARGUMENT ................................................................................................12

    I.    Legal Standard..............................................................................12

    II.    The District Court Erred in Finding the Molten Material
    Endorsement Unambiguously Applied to Limit JWA's
    Coverage........................................................................................13

        A.    The Relevant Policy Sections Are Circular and Unclear..........14

            1.    The Policy's Instructions Regarding Application
                of Sublimits Are Circular and Unclear...........................14

            2.    Other Relevant Policy Sections Are Ambiguous
                and Can Reasonably Be Read to Provide
                Coverage ........................................................................19

            3.    The Policy Is Ambiguous for Other Reasons.................23

        B.    Reading the Molten Material Endorsement to Apply to
        the Losses Renders Other Policy Terms Superfluous...............26

        C.    The District Court Incorrectly Used a Proximate Cause
        Standard from Tort Law, but Controlling Law Requires
        Courts to "Look No Further" "If the Cause Closest in
        Time or Place" Is a Covered Peril ............................................31

1. In Interpreting Insuring Clauses, Courts Must Find Coverage if the Nearest Efficient Cause Is a Covered Peril ...................................................................31

2. Insurers Could Have Drafted the MME to Apply to Any Loss Involving Molten Material in Any Way, but Failed to Do So ................................................36

3. Even if the Molten Material Endorsement is Considered an Exclusion, It Can Reasonably Be Read to Not Apply to the Losses ...................................39

D. JWA's Interpretation Would Cause the Policy to Comply with Law Applicable to Claims Made at Other Locations ...................................................................43

III. Latent Ambiguity Arises When Applying the Molten Material Endorsement to the Facts of the Losses ............................................46

A. The Molten Material Endorsement Can Reasonably Be Applied to JWA's Losses in Multiple Ways ............................47

B. Extrinsic Evidence Demonstrates that the Policy Is Latently Ambiguous...................................................................49

IV. JWA Did Not Reasonably Expect the Molten Material Endorsement to Apply to Ensuing Fire or Other Harms....................51

CONCLUSION ........................................................................................52

STATEMENT REGARDING ORAL ARGUMENT ...........................................53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*American Auto Ins. Co. v. Valentine*,
    131 F. App'x 406 (4th Cir. 2005)............................................................*passim*

*Association of Apartment Owners of Imperial Plaza v.*
    *Fireman's Fund Ins. Co.*,
    939 F. Supp. 2d 1059 (D. Hi. 2013) ............................................................28

*Auto Club Fam. Ins. Co. v. Pack*,
    No. 1611-CC-0829 (Mo. 11th Jud. Cir. Jun. 26, 2018), *aff'd*, 582
    S.W.3d 902 (Mo. Ct. App. 2019) ................................................................44

*Auto Owners Ins. Co. v. Newman*,
    684 S.E.2d 541 (S.C. 2009).....................................................................7, 19, 26

*Auto-Owners Inc. Co. v. Goode*,
    294 S.W.3d 32 (Ky. Ct. App. 2009)............................................................17

*Auto-Owners Ins. Co. v. Cincinnati Ins. Co.*,
    395 F. Supp. 3d 686 (D.S.C. 2019) .......................................................13, 40

*Beaufort Cnty Sch. Dist. v. United Nat'l Ins. Co.*,
    392 S.C. 506 (S.C. Ct. App. 2011) ..............................................................47

*Bell v. Progressive Direct Ins. Co.*,
    757 S.E.2d 399 (S.C. 2014)...................................................................13, 52

*Bennett & Bennett Const., Inc. v. Auto Owners Ins. Co.*,
    747 S.E.2d 426 (S.C. 2013) ..................................................................13, 18

*Brewington v. State Farm Mut. Auto. Ins. Co.*,
    45 F. Supp. 3d 1215 (D. Nev. 2014) ...........................................................16

*Brooklyn Bridge, Inc. v. S.C. Ins. Co.*,
    420 S.E.2d 511 (S.C. Ct. App. 1992) ..........................................................31

*Canopius US Ins., Inc. v. Middleton*,
    202 F. Supp. 3d 540 (D.S.C. 2016) .....................................................*passim*

*Carolina Ceramics, Inc. v. Carolina Pipeline Co.*,
    161 S.E.2d 179 (S.C. 1968) .........................................................................12

iv

*Cherokee Nation v. Lexington Ins. Co.*,
   521 P.3d 1261 (Okla. 2022)...........................................................................28

*Coats v. Reliance Standard Life Ins. Co.*,
   No. 16-CV-0233-TCK-JFJ, 2019 WL 2435677 (N.D. Okla. June 11,
   2019)..........................................................................................................16

*Crabtree v. State Farm Ins. Co.*,
   632 So. 2d 736 (S.C. La. 1994) ...................................................................17

*Farm Bureau Mut. Ins. Co. v. Berlin*,
   No. 2005–UP–062, 2005 WL 7082978 (S.C. Ct. App. Jan. 25, 2005) ...35, 40

*Farm Bureau Property & Casualty Insurance Co. v. Sparks*,
   619 F. Supp. 3d 1104 (D. Utah 2022) .....................................................15, 16

*Gaskins v. Blue Cross–Blue Shield of South Carolina*,
   245 S.E.2d 598 (S.C. 1978)...............................................................7, 23, 35

*Greenville Cnty. v. Ins. Reserve Fund*,
   443 S.E.2d 552 (S.C. 1994) .........................................................................13

*Gulf Underwriters Ins. Co. v. KSI Svcs., Inc.*,
   233 F. App'x 239 (4th Cir. 2007)..................................................................42

*Hann v. Carolina Cas. Ins. Co.*,
   167 S.E.2d 420 (1969)..................................................................................30

*Hastings v. Union Fire Ins. Co.*,
   125 S.E. 923 (S.C. 1924)........................................................................49, 50

*Hawkins v. Greenwood Dev. Corp.*,
   409 S.E.2d 875 (S.C. Ct. App. 1997) ...........................................................13

*Jersey Insurance Company of New York v. Heffron.*,
   242 F.2d 136 (4th Cir. 1957) ........................................................................38

*King v. N. River Ins. Co.*,
   297 S.E.2d 637 (S.C. 1982) ..........................................................................52

*Lesley v. Am. Sec. Ins. Co.*,
   199 S.E.2d 82 (1973)..............................................................................*passim*

*Maryland Cas. Co. v. Gaffney Mfg. Co.*,
   76 S.E. 1089 (S.C. 1913) ..............................................................................50

*National Casualty Co. v. Coastal Development Services Foundation*,
    171 F. App'x 680 (9th Cir. 2006) ................................................................16

*Ostrowiecki v. Aggressor Fleet, Ltd.*,
    No. 07-6598, 2008 WL 3914901 n.3 (E.D. La. Aug. 19, 2008) ..................16

*Pedicini v. Life Ins. Co. of Alabama*,
    682 F.3d 522 (6th Cir. 2012) ......................................................................16

*Penton v. J.F. Cleckley & Co.*,
    486 S.E.2d 742 (S.C. 1997) ........................................................................12

*S.C. Ins. Guar. Ass'n v. Broach*,
    291 S.C. 349 (1987) ....................................................................................40

*Scipio v. United Bankshares, Inc.*,
    119 F. App'x 431 (4th Cir. 2004) ...............................................................17

*Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*,
    377 F.3d 408 (4th Cir. 2004) ......................................................................12

*South Carolina Dept. of Nat. Res. v. Town of McClellanville*,
    550 S.E.2d 299 (S.C. 2001) ........................................................................12

*South Carolina Farm Bureau Mutual Insurance Co. v. Durham*,
    671 S.E.2d 610 (S.C. 2009) ........................................................................37

*Stevenson v. Connecticut General Life Ins. Co.*,
    265 S.C. 348 (1975) ....................................................................................35

*Uncork and Create LLC v. Cincinnati Insurance Co.*,
    27 F.4th 926 (4th Cir. 2022) .......................................................................28

*Ward v. Dixie Nat'l Life Ins. Co.*,
    257 F. App'x 620 (4th Cir. 2007) .............................................26, 30, 39, 47

**Statutes & Other Authorities:**

17A Am. Jur. 2d Contracts § 339 (1991) ...............................................................13

28 U.S.C. § 1291 .....................................................................................................2

28 U.S.C. § 1332(a) ............................................................................................1, 2

28 U.S.C. § 2201 ................................................................................................1, 2

28 U.S.C. § 2202 ................................................................................................1, 2

43 Am. Jur. 2d Insurance § 440 (2024) .................................................................36

Couch on Ins. § 148:60 .......................................................................28

Local Rule 32.1(b) ............................................................................44

Mo. Ann. Stat. § 379.160 ..................................................................44

Mo. Code Regs. Ann. tit. 20, § 500-1.100(1) ...................................44

N.Y. Ins. Law § 3404(e) ...................................................................44

# INTRODUCTION

This case involves interpretation of an insurance policy that Appellant JWA purchased from Appellee-Insurers. At issue is whether a policy endorsement and related sublimit for "direct physical loss or damage cause[d] by heat from Molten Material" unambiguously limits JWA's recovery for damage caused by fire, water, falling debris, and a utility shutdown that occurred in a chain of events involving a small splatter of molten aluminum. This question turns on whether those distinct events—each of which carried distinct perils causing distinct types of harm—can reasonably be considered anything other than a single "occurrence," and whether JWA's damages can reasonably be considered to be directly caused by perils other than heat from molten material. Because the Policy can reasonably be read to consider the events leading to JWA's losses as separate occurrences and/or to consider JWA's damages as directly caused by perils other than heat from molten material, reversal is required.

# JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction in this case pursuant to 28 U.S.C. §§ 2201, 2202 & 1332(a). There was an actual and justiciable controversy between Appellant JW Aluminum Company ("**JWA**") and Appellees ACE American Insurance Company ("**ACE**"), Westport Insurance Corporation ("**Westport**"), AIG Specialty Insurance Company ("**AIG**"), General Security

Indemnity Company Of Arizona ("**GSINDA**," and with ACE, Westport, and AIG, "**Insurers**") within the meaning of 28 U.S.C. § 2201 regarding Insurers' obligation to indemnify JWA under an All-Risk Policy (the "**Policy**") JWA purchased from Insurers for losses sustained as a result of an August 4, 2020 chain of events at JWA's Goose Creek, South Carolina facility (collectively, the "**Losses**"). The District Court had diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeded the jurisdictional amount of $75,000, exclusive of interest and costs, and the controversy is between citizens of different states.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because this appeal arises from a final judgment from the District Court of South Carolina, and JWA timely filed its notice of appeal on March 13, 2024. The District Court granted partial summary judgment in Insurers' favor on December 15, 2023, leaving open certain remaining issues for trial. The parties settled the remaining issues in February 2024, and on February 28, 2024, the District Court entered a final judgment in favor of Insurers, from which JWA appeals.

## STATEMENT OF THE ISSUE

Did the District Court err in holding that an insurance policy provision "insur[ing] against direct physical loss or damage cause[d] by heat from Molten Material" and related sublimit unambiguously applied to limit recovery for losses with other nearer efficient causes (such as fire, water, and equipment shutdown)

where the relevant policy language is circular, unclear, and can reasonably be read in a way that would not so-limit coverage?

## STATEMENT OF THE CASE

### A. Relevant Facts

Founded in South Carolina, Appellant JW Aluminum Company ("**JWA**") owns and operates facilities around the country to melt, process, and finish large coils of aluminum, which are then sold to manufacturers in the construction, RV, HVAC, and other industries.[1] In 2019, JWA purchased an all-risk insurance policy from four insurance companies[2] covering JWA's facilities around the country for the year 2020.[3] The Policy provided blanket coverage from all risks (unless otherwise excluded) at all of JWA's locations throughout the US.[4] The Policy included an endorsement and related sublimit providing that the Policy "insure[s] against direct physical loss or damage cause[d] by heat from Molten Material, which has been accidentally discharged from equipment, subject to a limit of $10,000,000 per occurrence" (the "**Molten Material Endorsement**" or "**MME**").[5]

---

[1] JA7949-7950; JA4936.

[2] Although there are four separate insurance contracts, there is no discernable difference between the language in the policies relevant to the case. Therefore, citations are to language from the ACE Policy because ACE was the lead insurer and held the largest share of JWA's coverage.

[3] JA7950.

[4] JA266; JA312; JA339-340; JA349.

[5] JA315.

On August 4, 2020, the Losses occurred at JWA's Goose Creek, South Carolina facility over a period of several hours.[6] First, small pieces of molten metal "popped" out of a mold into which workers were draining molten aluminum. This type of small, accidental discharge of molten material is common in the metals industry and was very likely caused by rapid expansion of drops of water left in the mold from a tropical storm that had passed through the day prior.[7] The small droplets of molten metal flew approximately 30 feet into the air and landed on a beam supporting the facility's roof, resulting in minor heat damage to the beam and causing aluminum dust on the beam to ignite.[8] That fire spread to the roof, causing debris to fall onto the machinery below.[9] As a result of the roof fire, JWA shut down its power and gas lines to avoid a catastrophic explosion.[10] As a result, thousands of pounds of molten aluminum froze in places it was not supposed to, causing the bulk of JWA's damages.[11] The fire department arrived and sprayed water to extinguish the blaze, causing water and corrosion damage to JWA's sensitive precision

---

[6] JA228-229; JA996-998; JA7956-7957.

[7] *Hurricane Isaias: August 3-4, 2020*, National Weather Service, https://www.weather.gov/ilm/HurricaneIsaias2020#:~:text=Hurricane%20Isaias%20(pronunciation%3A%20ees%2D,sustained%20winds%20near%2085%20mph (last visited June 3, 2024).

[8] JA226-227; JA891; JA3408; JA7956-7957.

[9] JA996-1003; JA2518; JA7956-7957.

[10] JA227-229; JA998; JA7957.

[11] JA2312; JA2514-2517; JA4525; JA7956-7957.

equipment.[12] All told, JWA suffered approximately $35 million in property damage as a result of the fire, falling debris, water, and utility shutdown.[13] Insurers do not contend that the Losses were the result of any negligence or failure by JWA.

JWA made a claim with Insurers, who raised several arguments against coverage, including that the MME limited their liability to $10 million.[14] After waiting months to receive benefits due under the Policy, JWA filed suit in April 2021, and several Insurers filed counterclaims shortly thereafter.[15]

### B.    Procedural History

On April 4, 2023, JWA and Insurers cross-moved for summary judgment on the applicability of the MME, among other issues.[16] The District Court held oral argument on the summary judgment and other pending motions on November 28, 2023.[17] On December 15, 2023, the District Court entered an Order on the motions (the "**Order**"), finding in relevant part that the MME unambiguously applied to limit JWA's damages.[18] The parties subsequently settled all remaining issues in February

---

[12] JA2493; JA7956-7957.

[13] JA2494-2495.

[14] JA666-668; JA677-678; JA706; JA715; JA725-726; JA728; JA749-750; JA752-758.

[15] JA32-52; JA53-68; JA69-117.

[16] JA124-173; JA1055-1107; JA2422-2466.

[17] JA7824.

[18] JA7948.

2024, and the District Court entered a final judgment on February 28, 2024 referencing and incorporating its Order, from which JWA appeals.[19]

## SUMMARY OF ARGUMENT

The District Court's decision that the MME unambiguously applies to limit JWA's recovery must be reversed because the Policy can reasonably be read in multiple ways, both on its face and when applied to the facts of the Losses. The relevant Policy sections are circular, unclear, and inconsistent, and the District Court applied an incorrect causation standard. At a minimum, the Policy can reasonably be interpreted in a way that provides JWA more than $10 million of coverage for the Losses. No more is required for reversal.

At this stage, JWA and Insurers do not dispute the sequence of events leading to the Losses nor the general magnitude of JWA's property damages. The sole issue on appeal is whether the MME applies to limit JWA's recovery for damages caused by fire, falling debris, water, and utility shutdown. This analysis involves three independent inquiries: (1) Whether the Policy is ambiguous—*i.e.*, subject to multiple reasonable interpretations—on its face (patent ambiguity); (2) whether the Policy is ambiguous as applied to the Losses (latent ambiguity); and (3) whether applying the MME to the Losses would be contrary to JWA's reasonable expectations at the time it purchased the Policy, even if the Policy is technically unambiguous. In sum,

---

[19] JA8026-8028.

reversal is required if the Policy—either on its face or as applied to the Losses—is susceptible to a reasonable interpretation giving JWA more than $10 million in coverage, or if there is evidence from which a factfinder could conclude JWA reasonably expected the MME would not apply to accidents like the Losses.

To determine patent ambiguity, the Court must construe the Policy as a whole, giving effect to all terms and definitions, and using undefined words' common meanings. *See Auto Owners Ins. Co. v. Newman*, 684 S.E.2d 541, 545 (S.C. 2009). If the Policy is "susceptible to more than one reasonable interpretation, one of which would provide coverage," the court "must hold as a matter of law in favor of coverage." *Gaskins v. Blue Cross–Blue Shield of South Carolina*, 245 S.E.2d 598, 602 (S.C. 1978). Put differently, JWA need only prove that its interpretation is reasonable to be entitled to reversal.

The District Court erred in finding that the Policy unambiguously limited JWA's coverage for four reasons.

***First***, the District Court's Order relied on circular, unclear, and contradictory Policy language. The Policy is a patchwork of edits, amendments, and other changes made over many years by many different parties, often in an inconsistent, incomplete, or outright contradictory manner. The document is full of capitalized terms that are undefined, defined terms referenced nowhere, and provisions that lead to circular, absurd, or ambiguous results when read together. The Policy provisions

on which the District Court relied, including the MME, contain many of these defects. When read in context, these Policy provisions can reasonably be interpreted to not limit JWA's damages.

*Second*, the District Court's interpretation contradicts and renders superfluous other terms and entire sections of the Policy. The MME narrowly applies only to "direct physical loss or damage cause [sic] by heat from Molten Material,"[20] while other sublimits and endorsements apply more broadly to limit coverage for damage caused "directly or indirectly" by certain perils,[21] for "Consequential loss,"[22] and/or "regardless of any other cause or event contributing concurrently or in any other sequence to the loss."[23] To nonetheless apply the bare-bones MME to the Losses would read this expansive language in other endorsements out of the Policy. Doing so would also render meaningless the terms "direct" and "heat from molten material" as they appear in the MME. These necessary results of the District Court's reasoning violate fundamental rules of contract construction. At the very least, they show that there are other reasonable interpretations of the Policy—which is all that is required for reversal.

---

[20] JA315.

[21] JA332.

[22] JA295.

[23] JA333.

**Third**, the District Court used the wrong causation standard, and its interpretation violates established South Carolina and Fourth Circuit law regarding causation for purposes of determining insurance coverage. South Carolina law requires any ambiguity be interpreted in favor of insureds, and it directs courts to find coverage whenever there is a reasonable basis to do so, even if there is also a reasonable policy interpretation resulting in reduced or no coverage. The Supreme Court of South Carolina has instructed, "If the *nearest efficient cause* of the loss is one of the perils insured against, the courts *look no further*" in finding coverage under an insuring clause. *Lesley v. Am. Sec. Ins. Co.*, 199 S.E.2d 82, 85 (1973) (emphases added). But the District Court's Order, which found the MME was an insuring clause, used tort law causation principles to skip the first step and look beyond the nearest efficient causes of the Losses and find that heat from molten material was the proximate cause. This was error because "proximate cause has a different meaning in insurance cases than it has in tort cases." *Id.* Here, the nearest efficient causes of JWA's Losses are water, fire, falling debris, and utility shutdown—perils that are not subject to any sublimit or exclusion. Even if the MME is considered an exclusionary clause, which are subject to different causation standards than insuring clauses, the Policy can still reasonably be read to provide more than $10 million of coverage.

***Fourth***, JWA's interpretation is reasonable because it accords with law that would be applicable to other claims under the Policy. The Policy covers property in multiple states, shows a clear intent that it be interpreted consistently across jurisdictions and in accordance with any applicable law or regulations, and explicitly states that it should be deemed reformed to comply with any law with which it is in conflict. However, Insurers and the District Court's interpretation—that the MME applies to all perils and damage connected in any way to heat from molten material— would cause the Policy to violate minimum coverage laws applicable to other property insured under the Policy. This is an illogical result inconsistent with the parties' explicitly expressed intent, and at the very least demonstrates that there are multiple reasonable interpretations.

Even if the Policy is unambiguous on its face, the Court should find that it is latently ambiguous. As applied to JWA's Losses, the Policy can reasonably be interpreted in a way that does not limit JWA's coverage. This interpretation accords with undisputed parol evidence (including Insurers' own underwriting guidelines), controlling authority regarding causation in the context of insurance policies, and established principles of contract construction. Insurers' claim that heat from molten material is the "cause" of the Losses, rather than other nearer perils (fire, water, utility shutdown, etc.) or earlier causes (moisture in the drain mold), is based on commercial incentives, not principled contractual analysis. Allowing insurers to

minimize coverage by selecting which link in a causal chain determines coverage when the policy is ambiguous on that point would render much insurance coverage illusory to the detriment of insureds in the state, going against decades of South Carolina public policy.

Separately, even if the Policy is technically unambiguous, reversal is still required because JWA did not reasonably expect that the MME would apply to ensuing fire or other harms. Applying the MME to the Losses would produce an unreasonable and inequitable result and cause "the fine print [to] take[] away that which has been given by the large print." *Canopius US Ins., Inc. v. Middleton*, 202 F. Supp. 3d 540, 550-51 (D.S.C. 2016) (collecting cases).

JWA does not need to demonstrate—and this Court does not need to find— that Insurers and the District Court's interpretation is unreasonable or that JWA's interpretation is more reasonable, only that there is *a* reasonable interpretation of the Policy more favorable to JWA than that adopted by the District Court. Because the Policy is patently and/or latently ambiguous, and because JWA did not reasonably expect that the MME would apply to accidents like the Losses, the Court must reverse the District Court's determination that the MME limits JWA's recovery to $10 million.

# ARGUMENT

## I.  <u>Legal Standard</u>

When an appeal involves a matter of contract interpretation, the standard of review is *de novo*. *Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 408, 418 (4th Cir. 2004) ("The interpretation of a written contract is a question of law that turns upon a reading of the document itself, and a district court is in no better position than an appellate court to decide such an issue.").

"It is a question of law for the court whether the language of a contract is ambiguous." *South Carolina Dept. of Nat. Res. v. Town of McClellanville*, 550 S.E.2d 299, 302-03 (S.C. 2001). "An ambiguous contract is one capable of being understood in more ways than just one or one unclear in meaning because it expresses its purpose in an indefinite manner." *Penton v. J.F. Cleckley & Co.*, 486 S.E.2d 742, 745 (S.C. 1997); *see also Carolina Ceramics, Inc. v. Carolina Pipeline Co.*, 161 S.E.2d 179, 181 (S.C. 1968) ("[A]n ambiguous contract is one capable of being understood in more senses than one, an agreement obscure in meaning, through indefiniteness of expression, or having a double meaning."). Stated differently, "A contract is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or

business." *Hawkins v. Greenwood Dev. Corp.*, 409 S.E.2d 875, 878 (S.C. Ct. App. 1997) (citing 17A Am. Jur. 2d *Contracts* § 339, at 346 (1991)).

Under South Carolina law,[24] "Where the words of an insurance policy are capable of two reasonable interpretations, that construction will be adopted which is most favorable to the insured." *Greenville Cnty. v. Ins. Reserve Fund*, 443 S.E.2d 552, 553 (S.C. 1994) (citation omitted). "A policy clause extending coverage must be liberally construed in favor of coverage, while insurance policy exclusions are construed most strongly against the insurance company, which also bears the burden of establishing the exclusion's applicability." *Auto-Owners Ins. Co. v. Cincinnati Ins. Co.*, 395 F. Supp. 3d 686, 690-91 (D.S.C. 2019) (citations omitted). Insurance policies are otherwise subject to the general rules of contract construction under South Carolina law. *See Bell v. Progressive Direct Ins. Co.*, 757 S.E.2d 399, 406 (S.C. 2014). Terms not defined in an insurance policy must be given their "plain, ordinary, and popular meaning." *Bennett & Bennett Const., Inc. v. Auto Owners Ins. Co.*, 747 S.E.2d 426, 428 (S.C. 2013).

## II.   <u>The District Court Erred in Finding the Molten Material Endorsement Unambiguously Applied to Limit JWA's Coverage.</u>

The District Court's conclusion that the MME unambiguously applied to the Losses was incorrect for four reasons. First, the Policy sections and terms on which

---

[24] The Parties do not dispute that South Carolina law applies. JA7966.

the District Court relied are circular, inconsistent, and unclear. Second, the District Court's interpretation makes large portions of the Policy redundant or meaningless. Third, the District Court erred in using tort law causation principles that the Supreme Court of South Carolina has held are inappropriate in assessing coverage under an insurance policy. Fourth, JWA's proffered interpretation would cause the Policy to comply with applicable law while Insurers and the District Court's interpretation would violate that law, a result inconsistent with the parties' explicit expressed intent.

## A.     The Relevant Policy Sections Are Circular and Unclear.

The Policy and MME are patently ambiguous because they contain circular definitions and inconsistent and unclear instructions about how sublimits like the MME are to be applied. Moreover, the plain, ordinary meanings of many terms that are crucial to determining applicability of sublimits support JWA's interpretation.

### 1.     The Policy's Instructions Regarding Application of Sublimits Are Circular and Unclear.

The District Court's conclusion that the MME unambiguously applied to all damage caused by the Losses rested on application of the Policy's "Condition M" and definition of the term "Occurrence." But when read together, these terms are circular and susceptible to multiple reasonable interpretations.

Condition M, which the District Court explained "provides guidance on how sublimits work," states that a sublimit "applicable to a specific cause of loss shall

apply to all losses arising out of any one Occurrence."[25] "Occurrence" is defined as "any loss or series of losses arising out of one event."[26] Read together, these provisions state that "a sublimit applicable to a specific cause of loss shall apply to **all losses arising out of any loss or series of losses** arising out of one event."[27] This is entirely circular and subject to multiple reasonable interpretations.

Courts regularly find insurance policies employing similarly circular terms to be patently ambiguous. For example, in *Farm Bureau Property & Casualty Insurance Co. v. Sparks*, an insurer sought a declaration that the defendant-insured had no insurable interest in an ATV involved in an accident because the ATV was owned by the insured's business rather than the insured personally. 619 F. Supp. 3d 1104, 1115 (D. Utah 2022). The relevant policy "provide[d] coverage for vehicles 'owned' by the insured," but "define[d] 'owned' as '[a] vehicle "owned" by you or leased by you under a written agreement for a continuous period of at least six months.'" *Id.* at 1113-14. As a result, "[i]n essence, the Policy define[d] 'owned' as 'a vehicle owned by you.'" *Id.* The District Court explained that "Such a circular

---

[25] JA275-276; JA7977.

[26] JA280.

[27] The terms "loss" and "event" are not defined in the Policy. As discussed below, the common meaning of "event" supports JWA's interpretation, or at the very least renders the Policy and MME ambiguous.

definition … is inherently ambiguous and provides the court no guidance as to how to determine ownership." *Id.* at 1114.

Similarly, in *National Casualty Co. v. Coastal Development Services Foundation*, the Ninth Circuit reversed a district court's grant of summary judgment for a D&O insurer where the relevant policy was similarly circular to that at issue here. 171 F. App'x 680, 684 (9th Cir. 2006). There, the policy obligated the insurer to "to defend any CLAIM made ... seeking DAMAGES," and the insurer's "obligations to [insured] turn[ed] on whether [a] class action [against insured] meets [the policy's] definition of 'DAMAGES.'" *Id.* The Ninth Circuit found the policy was circular and therefore patently ambiguous because it "defines a 'CLAIM [as] a demand or suit made upon the INSURED for DAMAGES.' Yet 'DAMAGES means a monetary judgment, award or settlement arising from a covered CLAIM.'" *Id.* Numerous other Federal Circuit courts,[28] District Courts,[29] and state appellate

---

[28] *See, e.g.*, *Pedicini v. Life Ins. Co. of Alabama*, 682 F.3d 522, 529 (6th Cir. 2012) (finding insurance policy "patently ambiguous" regarding insurers' obligation to reimburse insured because term "actual charges" was "hopelessly circular, as the term 'actual charges' even appears within its own definition in the policy").

[29] *See, e.g.*, *Brewington v. State Farm Mut. Auto. Ins. Co.*, 45 F. Supp. 3d 1215, 1219 (D. Nev. 2014) ("Such circular definitions are inherently ambiguous as they require additional information outside the definition to actually define the term being defined."); *Coats v. Reliance Standard Life Ins. Co.*, No. 16-CV-0233-TCK-JFJ, 2019 WL 2435677, at *5 (N.D. Okla. June 11, 2019), *appeal dismissed* (Sept. 3, 2019) ("[T]he circularity … renders the definition of [key term] ambiguous"); *Ostrowiecki v. Aggressor Fleet, Ltd.*, No. 07-6598, 2008 WL 3914901, at *1 n.3 (E.D. La. Aug. 19, 2008) ("Given the circularity of the Bodily Injury definition, the

courts[30] have reached the same conclusion: Circular terms make for a patently ambiguous insurance policy.

This Court has employed similar reasoning in finding a retirement plan was ambiguous as to what benefits—calculated based on employee's earnings—were due the employee where "the definition of the term 'Earnings' includes the word 'earnings.'" *Scipio v. United Bankshares, Inc.*, 119 F. App'x 431, 435 (4th Cir. 2004). This Court recognized that such circular contract terms are "of little benefit to resolving the question of whether the term was meant to include" certain things argued by the parties. *Id.*

The same is true here. The Policy's instruction that sublimits are to be applied "to all ***losses arising out of any loss or series of losses*** arising out of one event" is circular and ambiguous. The clause "arising out of one event" does not make things clearer and, if anything, supports JWA's argument that the MME is inapplicable to damage caused by fire, water, falling debris, and utility shutdown. Because the term

Court concludes that this definition is ambiguous. Such ambiguity is to be construed against the drafter … and in favor of coverage.").

[30] *See, e.g.*, *Crabtree v. State Farm Ins. Co.*, 632 So. 2d 736, 744 (S.C. La. 1994) (finding insurance policy was ambiguous because term "bodily injury" was "circular in that the term being defined is used within its own definition: '*Bodily injury* is *bodily injury* to a person, and sickness, disease or death which results from it'"); *Auto-Owners Inc. Co. v. Goode*, 294 S.W.3d 32, 36 (Ky. Ct. App. 2009) (finding policy ambiguous where definition of "automobile" "is circular because it essentially defines automobile as an automobile").

"event" is undefined in the Policy, the Court must look to the term's plain and ordinary meaning. *Bennett*, 747 S.E.2d at 428. "Event" is defined as "something that takes place, especially a significant occurrence" or "a phenomenon or occurrence located at a single point in spacetime."[31] At a minimum, Condition M can reasonably be read to consider each link in a causal chain to be a separate "occurrence located at a single point in spacetime" or "event." This is particularly true where those events carry distinct perils causing distinct types of harm, discussed in Section II.A.2, *infra*.

This reasoned interpretation would give JWA more coverage than that adopted by the District Court. Because only the discharge of molten material onto the support beam involved direct physical damage caused by heat from molten material, the MME would only apply to limit JWA's recovery with respect to heat damage to the beam—a result that accords with the plain language of the endorsement ("…direct physical loss or harm cause[d] by heat from Molten Material…").[32]

In finding that Condition M limited JWA's coverage to $10 million, the District Court observed that Condition M states that it is not applicable to "fire or explosion which occur as a direct result of a Flood or Earth Movement" and reasoned

---

[31] *Event*, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=event (last visited June 3, 2024).

[32] JA315.

that the parties could have included a similar carve-out for fire resulting from molten metal spills.[33] However, "Occurrence" is defined differently with respect to Earth Movement or Flood as "the sum total of all the losses sustained by the Insured as the result of damage from Earth Movement or Flood which arise during a continuous period of seventy-two (72) hours."[34] In other words, the Policy explicitly contemplates that the Earth Movement and Flood sublimit, unlike the MME, would apply to a chain reaction of different perils and types of harm. From this, it can be reasoned that the parties *did not* intend that the MME would apply to an hours-long sequence of events involving damage caused by perils other than heat from molten material, like the Losses. *See Newman*, 684 S.E.2d at 545. Because the parties never intended the MME to apply to other types of harm occurring in sequence (such as fire, water damage, etc.), there was no reason to include a similar carve-out in Condition M for the MME.

      2.      <u>Other Relevant Policy Sections Are Ambiguous and Can Reasonably Be Read to Provide Coverage.</u>

Other relevant Policy sections can reasonably be read to support this result. The Policy's "Perils Insured" section, on which the District Court also based its

---

[33] JA7977.

[34] JA280.

decision, is equally ambiguous when read in context with the MME and Condition M. The Perils Insured section states:

> This policy insures against all risks of direct physical loss or damage to Property insured from perils not otherwise excluded, subject to the terms and conditions of this policy.

> In the event of such direct physical loss or damage to any Property Insured at the Premises Described in the Declarations, and such damage, without the intervention of any other independent cause, results in a sequence of events which causes physical damage to other Property Insured by this policy, then this policy will cover such resulting loss or damage.[35]

The terms "peril," "cause," and "event," all of which are central to interpreting and applying this provision (and Condition M), are not defined in the Policy. Looking to the common definitions of these words does not make things clearer. The term "peril" means "Exposure to the risk of harm or loss" or "Something that endangers or involves risk."[36] The Policy provides examples of "perils," including earth movement, flood, fire, lightning, earthquake, explosion, smoke, and mechanical and electrical breakdown.[37] "Cause" means "The producer of an effect, result, or consequence" and the "person, event, or condition, that is responsible for

---

[35] JA266.

[36] *Peril*, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=peril (last visited June 3, 2024).

[37] *See, e.g.*, JA295 (endorsement listing perils). That the Policy considers smoke a separate peril from fire shows an intent that events occurring in sequence (and resulting types of loss) be evaluated individually for purposes of determining coverage.

an action or result."[38] And as discussed above, "event" means "Something that takes place, especially a significant occurrence" or "A phenomenon or occurrence located at a single point in spacetime."[39]

In view of these definitions, each link in a causal chain can reasonably be considered a separate "event" ("phenomenon or occurrence located at a single point in spacetime") where those links involve distinct perils (things "that endanger[] or involve[] risk") causing ("producing" or being "responsible for") distinct types of harm.[40] Here, the Losses involved different perils causing very different types of harm. For example, the initial release of molten material caused minor heat damage to the support beam, while the utility shutdown caused tens of millions of dollars in damage when molten aluminum solidified in places it was not supposed to.

This interpretation is particularly reasonable where, as here, some events do not necessarily lead to subsequent events. For example, JWA would not have suffered water damage had it not called the fire department or had the fire department

---

[38] *Cause*, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=cause (last visited June 3, 2024).

[39] *Event*, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=event (last visited June 3, 2024).

[40] That JWA made one claim, rather than separate claims for each "event," does not compel a different result. As discussed herein, the Policy can reasonably be read to not apply the MME to all of JWA's Losses even if each step in the Losses is not considered a separate "event." As discussed in Section IV, JWA reasonably read the Policy this way and did not expect that the MME would apply to all damages from the Losses.

determined it safest to let the blaze burn itself out. Likewise, JWA would not have suffered damage from the utility shutdown had it not made the independent, intervening choice to shut off the facility's utilities.[41]

If causes of damage are considered separate "events," then they must necessarily be separate Occurrences, defined as "any loss or series of losses arising out of ***one event***,"[42] and therefore require separate analyses and applications of sublimits, including the MME. The District Court correctly recognized that, as defined in the Policy, "an [O]ccurrence has three parts: (1) any loss or series of losses (2) arising out of (3) one event."[43] However, the District Court erred in concluding that the Losses were all one "Occurrence" because the Policy can reasonably be read to consider each of the Losses to be separate events and therefore separate "Occurrences."

The fact that the Policy can reasonably be read to consider each of the causes of JWA's damage—fire, water, falling debris, and utility shutdown—to be separate "perils" supports JWA's interpretation. Indeed, fire and mechanical shutdown are explicitly listed as examples of individual perils. Each link in the causal chain (and their attendant, separate perils)—the release of molten metal (heat from molten

---

[41] Instead, the facility would have suffered a catastrophic explosion. *See* JA229.

[42] JA280 (emphasis added).

[43] JA7976.

material), fire on the support beam (fire), spread of fire to the roof (fire, falling debris), firefighting efforts (water), and utility shutdown (mechanical shutdown)—caused distinct losses to JWA, did not necessarily lead to one another, and therefore can reasonably be considered separate "events." Separate "events" produce separate "Occurrences," requiring separate application of Condition M. As applied here, Condition M would only limit coverage for heat damage to the support beam, the only instance of loss caused directly by heat from molten material, a reasonable construction more favorable to JWA than that adopted by the District Court.

JWA does not need to prove that this interpretation is the only reasonable interpretation or even the most reasonable interpretation, only that it is *a* reasonable interpretation. Even assuming the District Court's interpretation of the Policy is reasonable, the District Court's decision must still be reversed because controlling law requires courts applying South Carolina law to adopt the reasonable interpretation most favorable to the insured. *See Gaskins*, 245 S.E.2d at 602.

### 3. The Policy Is Ambiguous for Other Reasons.

The Policy and MME are ambiguous for additional reasons. This is not a case where the parties simply sat down and wrote out a contract as a clear expression of their intent. Instead, the Policy is a patchwork of terms that have been incrementally edited, supplemented, and modified over many years in inconsistent, incomplete,

and often contradictory ways.[44] These changes have created internal tension, inconsistency, and uncertainty; and as a result, the Policy can reasonably be read in several different ways. In addition to the circularity and multiple interpretations discussed above, the Policy is full of terms that are defined but not used anywhere, capitalized terms that are undefined, grammatical errors, and inconsistent internal references.

Some of these changes were even made retroactively. For instance, endorsements adjusting the total insured value at JWA's Goose Creek facility were made weeks, months, and in one case years after the changes became effective.[45] Lead Insurer ACE didn't issue an endorsement reflecting those value changes until more than two-and-a-half years after the changes took effect—and denied coverage based on those changes (before the endorsement memorializing the changes had even been issued).[46] In other words, Insurers themselves acknowledge that the plain text of the Policy has not always reflected the parties' intent and understanding, and

---

[44] JA138-139; JA724-726; JA727-728; JA424-426; JA455-456; JA488-489; JA501-504.

[45] JA551-553; JA556-559; JA561; JA562-565; JA567-571; JA573-578.

[46] JA551-553; JA2446-2451. The District Court found that that endorsement itself was ambiguous. JA7975. Although interpretation of that endorsement is not at issue in this appeal, it further demonstrates that the Policy is not the model of clarity and can be read in many different ways.

that resorting to extrinsic evidence is necessary to determine and enforce the parties' intent and agreement.

The MME itself suffers numerous defects as result of the incremental, inconsistent, and unclear edits made to its terms. For instance, the term "Molten Material" is capitalized in the MME but is not defined anywhere in the Policy.[47] The MME also contains a clear grammatical error ("direct physical loss or damage cause by heat from Molten Material") indicating that its terms were modified at some point, but without necessary corresponding changes to verb tense.[48] Moreover, the title of the endorsement itself appears to have been changed at some point: the MME is captioned "Endorsement—Molten Material," but the MME and its sublimit are referred to as "Water, Liquid, Power of Molten Material Damage" in the list of sublimits in the Policy's Declarations section.[49]

Where a contract is unclear or can be understood in multiple ways, courts must find it ambiguous. Here, it is difficult, if not impossible, to divine any contractual intent from the Policy and MME's rag-tag patchwork of terms without reference to

---

[47] JA315.

[48] JA315.

[49] JA263.

extrinsic evidence.[50] The District Court therefore erred in finding that the Policy and MME were unambiguous and limited JWA's coverage.

**B.    Reading the Molten Material Endorsement to Apply to the Losses Renders Other Policy Terms Superfluous.**

The District Court's reading of the MME renders other terms and provisions in the Policy—including terms in the MME itself—meaningless, in contravention of well-established rules of contractual construction. *See Newman*, 684 S.E.2d at 545 (rejecting interpretation of insurance policy that would render other language in policy "meaningless").

First, the District Court's interpretation of the MME ignores the term "heat" and the purpose of its inclusion in that endorsement. Heat is an essential component of fire, and Insurers knew that there was a risk of subsequent fire from the discharge of molten metal.[51] The endorsement could have been written to apply to *all* damage caused by molten material (rather than only damage caused by heat), to damage caused *directly or indirectly* by heat from molten material, or to damage caused by

---

[50] Ambiguity or any other defect in the Policy should not be held against JWA. "South Carolina law very clearly requires [courts] to resolve [any] ambiguity in favor of the insured" and "construe[] [policies] most liberally in favor of the insured." *Ward v. Dixie Nat'l Life Ins. Co.*, 257 F. App'x 620, 627 (4th Cir. 2007) (collecting cases) .

[51] One of the Insurer's own property underwriting guidelines for the aluminum and steel industries refers to ██████████████████████████████ ████████████████████████████ JA8111 (emphasis added).

heat from molten material *and consecutive fire*, but the MME is drafted in a way that could be reasonably interpreted to limit its application to heat damage only.[52] Further, molten material is obviously hot from its description as "molten." Why include the term "heat" at all, then? Rather than reading "heat" as a redundant descriptor of molten material, rules of contract construction demand that "heat" be construed as limiting the type of damage that would be subject to the endorsement's cap.

Second, the District Court's interpretation ignores the inclusion of the word "direct" in the MME. The Policy already excludes coverage for indirect loss,[53] so the inclusion of the word "direct" in the MME should be read as having have some other purpose. Moreover, other endorsements do not include the word "direct" and use broader and/or unqualified terms like "loss or damage" and "actual physical loss or damage" in describing the types of harm to which they are applicable.[54]

---

[52] It is common sense that heat and fire are not the same. All fire produces heat, but not all heat produces fire. Thus, courts differentiate between damage caused by heat and damage caused by fire. *See, e.g.*, *The Buckeye State*, 39 F. Supp. 344, 347 (W.D.N.Y. 1941) (stating "[c]learly damage may be done by 'heat' alone without 'fire,'" citing cases that show "the distinction between 'fire' and 'heat' as a cause of damage"). Insurance policies do as well—including the Policy at issue in this case. Further, heat supplies only one of three components necessary to start a fire, ignition; a fire also requires a fuel and an oxidizer. JA5008.

[53] JA273.

[54] JA314; JA316 .

Fourth Circuit precedent, insurance treatises, and common usage of the word "direct" support JWA's position. In *Uncork and Create LLC v. Cincinnati Insurance Co.*, this Court looked to Webster's definition of "direct," "proceeding . . . without deviation or interruption," in construing "direct physical loss or damage" in an insurance policy. 27 F.4th 926, 932 n.7 (4th Cir. 2022). Other courts interpreting the word "direct" in similar contexts have looked to dictionary definitions, which show that the word means proximity and immediacy.[55] Couch's treatise on insurance states, "In a provision in a policy insuring against direct loss and damage caused solely by a particular cause, the word 'direct' means merely 'immediate' or 'proximate' as distinguished from 'remote.'" Couch on Ins. § 148:60. Couch further explains that "[a]n otherwise remote cause is not a 'proximate cause' even though it may be in the line of causation." *Id*. at § 101:46 (emphasis added). This is consistent with South Carolina law regarding causation for purposes of insurance coverage, discussed in Section II.C, *infra*. Accordingly, the term "direct" can reasonably be read to limit the MME's application to the immediate, proximate damage caused by

---

[55] *See, e.g.*, *Cherokee Nation v. Lexington Ins. Co.*, 521 P.3d 1261, 1267 (Okla. 2022) (court looked to Webster's definition of direct, "proceeding from one point to another in time or space without deviation or interruption" and "stemming immediately from a source" to find the phrase "direct physical loss or damage" to require "*immediate* and actual, material, or tangible deprivation or destruction of property" (emphasis added)); *Association of Apartment Owners of Imperial Plaza v. Fireman's Fund Ins. Co*., 939 F. Supp. 2d 1059, 1068 (D. Hi. 2013) (looking to Black's Law definition of "direct loss:" "a loss that results immediately and proximately from an event").

the heat from the molten material discharged in the "pop:" minor heat damage to the support beam. JWA's other losses were more immediately and proximately caused by other covered perils: fire, water, falling debris, and forced utility shutdown.

Third, the District Court's interpretation renders language in other exclusions and sublimits meaningless. Take, for example, the Policy's Total Terrorism Exclusion which states:

> Notwithstanding any provision to the contrary within this Policy or any endorsement thereto, it is agreed that the Policy excludes loss, damage, cost, or expense of whatsoever nature **_directly or indirectly caused by, resulting from, or in connection with_** any act of terrorism **_regardless of any other cause or event contributing concurrently or in any other sequence to the loss_**.[56]

Other Policy provisions contain similar explicit, expansive language.[57] The MME, in stark contrast, contains none of this language and narrowly applies only to "direct physical loss or damage cause[d] by heat from Molten Material." Condition M likewise lacks this explicit, expansive language.[58] To nonetheless apply the bare-bones MME to all JWA's Losses—which were more directly caused by other perils—would render meaningless the expansive language in the Total Terrorism

---

[56] JA333 (emphases added).

[57] *See, e.g.*, JA283 (endorsement excluding damage for certain causes "regardless of any other cause or event contributing concurrently or in any sequence thereto"); JA294 (endorsement excluding coverage for "[l]oss or damage directly or indirectly caused by" certain causes); JA295 (similar); JA332 (similar).

[58] JA275-276.

Exclusion and other similar sections of the Policy. The District Court's Order does not address this contradiction.[59]

Further, the absence of this expansive language in the MME and Condition M, when it appears elsewhere in the Policy, indicates that the parties never intended the MME to apply to losses other than direct damage caused solely by heat from a molten metal discharge. If Insurers had intended the MME sublimit to apply to all loss or damage stemming in any way from the heat from molten material discharge—directly or indirectly, and regardless of any other event or cause (such as fire, water, etc.) contributing concurrently or in any sequence—then they would have added to the MME language like that in the Total Terrorism Exclusion. But they did not.

Because the contract here is an insurance policy, it must be construed "most liberally in favor the insured." *Ward*, 257 F. App'x at 627 (citing *Hann v. Carolina Cas. Ins. Co.*, 167 S.E.2d 420, 423 (1969)). Insurers could have easily cleared up any ambiguity about the MME with the addition (or removal) of a few words, but they failed to do so. The resulting ambiguity requires the Court to find that the

---

[59] The District Court noted that the Total Terrorism Exclusion contained a carve-out for fire resulting from an act of terrorism, but this fact cuts in favor of JWA's argument. JA7980-7981. As discussed in Section II.D, *infra*, this carve-out is intended to cause the Policy to comply with applicable state law "Standard Fire Policies" requiring a baseline level of coverage against damage caused by fires. That the MME does not include a similar carve-out shows that it was not intended to apply to a sequence of events, unlike the Total Terrorism Exclusion, which applies to "loss, damage, cost, or expense **of whatsoever nature directly or indirectly** caused by, resulting from, or in connection with" terrorism. JA333 (emphasis added).

endorsement does not apply to JWA's Losses here. *See Brooklyn Bridge, Inc. v. S.C. Ins. Co.*, 420 S.E.2d 511, 512-13 (S.C. Ct. App. 1992) (where "the simple addition of [] four words would have made the [relevant provision] clear and unambiguous," insurers' "failure to include these words lends itself to ambiguity," which must be interpreted in favor of coverage as a matter of law).

### C. The District Court Incorrectly Used a Proximate Cause Standard from Tort Law, but Controlling Law Requires Courts to "Look No Further" "If the Cause Closest in Time or Place" Is a Covered Peril.

In addition to the errors identified above, the District Court's decision rested on an incorrect causation standard. Regardless of whether the MME is considered an insuring clause or an exclusionary cause, it can reasonably be read under established insurance law causation principles to not apply to JWA's Losses.

#### 1. In Interpreting Insuring Clauses, Courts Must Find Coverage if the Nearest Efficient Cause Is a Covered Peril.

The District Court incorrectly narrowed its determination of the relevant cause of JWA's Losses by using only the proximate cause standard applicable in tort law. Then, based on that incorrect analysis, held that the MME limited JWA's damages to $10 million. But, the Supreme Court of South Carolina has explained that the causation standard used for purposes of determining the contours of insurance coverage is different than that applied in tort law to determine culpability. *Lesley*,

199 S.E.2d at 85. Under the appropriate standard, detailed by the Supreme Court in *Lesley*, the MME is inapplicable to the Losses.

In *Lesley*, a poultry farmer brought suit against their insurer for breach of contract after the insurer denied coverage for the loss of chickens following a thunderstorm. *Id*. at 84. Lighting from the storm caused the insured's facility to lose power for approximately four hours, during which time thousands of chickens died from excessive heat and suffocation. *Id.* The policy insured against "against 'death of the poultry, directly and immediately resulting from fire and lightning,'" but the insurer argued that the loss was not "the 'direct and immediate' result of the power interruption by lightning." *Id.* (cleaned up).

The Supreme Court explained "[t]he general rule of insurance law . . . that only the proximate cause of loss, and not the remote cause, is to be regarded in determining whether recovery may be had under a policy of insurance." *Id.* at 85 (citation and internal quotation marks omitted). However, the *Lesley* court cautioned that "proximate cause has a different meaning in insurance cases than it has in tort cases." *Id.* The court went on to explain:

> ***In tort cases*** the rules of proximate cause are applied for the single purpose of fixing culpability, and for that reason the ***rules reach back of both the injury and the physical cause*** to fix the blame on those who created the situation in which the physical laws of nature operated; ***in insurance cases*** the concern is not with the question of culpability or why the injury occurred, but ***only with the nature of the injury and how it happened***.

*Id.* (emphases added, internal citation omitted). As a result, the *Lesley* court instructed, "The maxim '*in jure, non remota causa sed proxima spectatur*,' [the immediate, not the remote, cause of any event is to be considered] is applied in a much more literal sense to cases in which the liability of an insurer is to be ascertained." *Id.*

The Supreme Court then outlined the two-step analysis courts applying South Carolina law must use to determine whether a loss is insured.

First, "[i]f the nearest efficient cause of the loss is one of the perils insured against, the courts look no further." *Id.* This Court has interpreted "nearest efficient cause" to mean "cause closest in time or place." *American Auto Ins. Co. v. Valentine*, 131 F. App'x 406, 410 (4th Cir. 2005) (citing *Lesley*, 199 S.E.2d at 85). Critically, the *Lesley* court went on to state that where the nearest efficient cause is a peril insured against, "the insurer is not to be relieved from responsibility by showing that the property was brought within the peril insured against by a cause not mentioned in the contract." 199 S.E.2d at 85. In other words, if the cause nearest the loss is insured against, an insurer cannot avoid or reduce coverage by pointing to a cause further back in the causal chain that is not an insured peril or offers less coverage, as Insurers have done here.

A court should only move to the second step if the nearest efficient cause is not an insured peril. Explaining the second step, the *Lesley* court stated that "[i]f the

33

nearest efficient cause of the loss is not a peril insured against, recovery may nevertheless be had if the dominant cause is a risk or peril insured against." *Id.* In contrast to the nearest efficient cause, the "dominant cause may be concurrent or remote in point of time or place." *Id.* So, only if the cause nearest the loss is not a covered peril do courts need to look further back to determine if a covered peril exists somewhere in the causal chain.

*Lesley* is illustrative of a case where the second step was necessary. There, the nearest efficient cause of the loss was the power outage, but that was not an insured peril. So, the court went to the second step, identifying the dominant cause, which "may be concurrent or remote in point of time or place." *See id.* at 85. The court then approved the use of the tort proximate cause standard in the jury charge to determine the dominant cause and upheld the jury's finding that lightning, a covered peril, was the dominant cause and thus coverage existed. *See id.* at 84-85. *Lesley* and its

causation framework have been cited with approval by this Court,[60] the Supreme Court of South Carolina,[61] and South Carolina appellate courts.[62]

The two-step analysis in *Lesley* provides a wider range of causes that give rise to insurance coverage than limiting the analysis to either the nearest efficient cause or the dominant cause (as the District Court did here). That makes sense under the established rule that insurance policies are interpreted asymmetrically in favor of coverage: they must be construed in favor of insureds and against insurers, and courts must find coverage whenever there is a reasonable basis to do so. *See, e.g.*, *Gaskins*, 245 S.E.2d at 602.

As mentioned above, here, the District Court skipped the first step (determining whether the nearest efficient cause is a covered peril), and instead jumped to the second step and used the proximate cause standard from tort law to conclude the molten material pop was the dominant cause and thus the MME applied. The District Court's failure to assess whether "the cause[s] closest in time

---

[60] *Valentine*, 131 F. App'x at 411 ("*Lesley* would be relevant if this case was about whether the brokers' losses arose out of the insuring clause of the insurance contract").

[61] *Stevenson v. Connecticut General Life Ins. Co.*, 265 S.C. 348, 354 (1975) ("See the case of *Lesley* . . . for discussion of the meaning of proximate cause of a loss, and how such is to be regarded in determining whether recovery may be had under the terms of an insurance policy.").

[62] *S.C. Farm Bureau Mut. Ins. Co. v. Berlin*, No. 2005–UP–062, 2005 WL 7082978 (S.C. Ct. App. Jan. 25, 2005).

or place"[63] of JWA's damages were covered perils was material error because those causes are all covered perils under the Policy: fire, water, falling debris, and utility shutdown. Therefore, as instructed by the Supreme Court in *Lesley*, the District Court should have "look[ed] no further" (*i.e.*, should not have reached back further to the initial "pop" of molten material) in determining coverage because there was no need to get to the "dominant cause" step of the analysis.[64] 199 S.E.2d at 85.

### 2. Insurers Could Have Drafted the MME to Apply to Any Loss Involving Molten Material in Any Way, but Failed to Do So.

The framework articulated in *Lesley* has also been referred to as the "independent concurrent causation doctrine." 43 Am. Jur. 2d Insurance § 440 (2024). That doctrine "provides that where a policy expressly insures against loss caused by one risk but excludes loss caused by another risk, coverage is extended to

---

[63] *Valentine*, 131 F. App'x at 410 (citing *Lesley*, 199 S.E.2d at 85).

[64] This Court has acknowledged that "*Lesley* [is] relevant" in cases "about whether the [insured's] losses arose out of the insuring clause of the insurance contract." *Valentine*, 131 F. App'x at 410. The District Court found the MME was an insuring clause, a conclusion supported by the Policy's text. The MME is phrased as a grant of coverage, JA315 (". . .this policy ***does insure against*** direct physical loss or damage cause[d] by heat from Molten Material. . .") (emphasis added), and is not specifically identified as an exclusion, unlike other endorsements which are clearly identified as such. *See, e.g.*, JA283 ("Endorsement – Biological or Nuclear Exclusion" stating "This policy ***does not insure*** against any loss, damage, cost or expense caused by or resulting from. . .") (emphasis added); JA295 ("Endorsement – Data Distortion/Corruption Exclusion" stating "The ***Insurer will not pay*** for Damage or Consequential Loss directly or indirectly caused by . . .") (emphasis added).

a loss caused by the insured risk even though the excluded risk is a contributory cause." *Id.*[65] To escape the ambit of this doctrine, many policies may include an "anticoncurrent causation clause" to "exclude[] damages partially stemming from an excluded cause, irrespective of any other concurrent or subsequent contributing cause or event." *See id.* Such clauses are enforceable in South Carolina. *See Durham*, 671 S.E.2d at 613. Insurers could have included an anti-concurrent causation clause in the MME—as they did elsewhere in the Policy[66]—explicitly stating that damage caused by heat from molten material is subject to the $10 million sublimit regardless of any other cause or event that contributes concurrently or in any other sequence.

---

[65] In *South Carolina Farm Bureau Mutual Insurance Co. v. Durham*, the Supreme Court of South Carolina acknowledged that this doctrine, the "concurrent cause rule,"—"which asks whether one of the causes of a loss is covered," and "[i]f so, then the loss is covered notwithstanding the fact that there is also an excluded cause in the chain of causation"—is one of the two primary approaches for determining covering under an insurance policy when there are multiple concurring causes of loss. 671 S.E.2d 610, 613 (S.C. 2009). The other primary approach is the "efficient proximate cause doctrine which provides that in circumstances with two or more identifiable causes, the court looks to the cause which is determined to have set the chain of events in motion." *Id.* Although the court in *Durham* did not expressly state which doctrine South Carolina follows (as it did not reach the issue), the Supreme Court's opinion in *Lesley* is a clear articulation of the concurrent cause rule, as acknowledged by this Court in *Valentine*. 131 F. App'x at 410.

[66] *See, e.g.*, JA271-272 ("Perils Excluded" section containing anti-concurrent causation clause); JA283 (Biological or Nuclear Exclusion containing anti-concurrent causation clause); JA295 (Data Distortion Exclusion containing anti-concurrent causation clause); JA332 (Terrorism Exclusion containing anti-concurrent causation clause); JA333 (Total Terrorism Exclusion containing anti-concurrent causation clause).

But, again, they did not. In light of the MME's express limitation to direct physical loss or damage caused by heat from molten material and the absence of any language in the Endorsement extending its application beyond that to consecutive events, the Endorsement can reasonably be interpreted to *not* apply to the Losses.

This Court reached a similar conclusion in considering a policy "insuring against direct loss by explosion" in *Jersey Insurance Company of New York v. Heffron*. 242 F.2d 136, 137 (4th Cir. 1957). There, an insured property was damaged when the neighboring building either collapsed (as defendant-insurer argued) or exploded (as plaintiff-insured argued). *Id.* at 137-38. The insurer argued that, even assuming an explosion had occurred, the loss was not covered because the explosion was "merely incidental to the collapse of the [neighboring] building." *Id.* at 139. The Fourth Circuit rejected that argument as "without merit" because, in the absence of an anti-concurrent causation clause, "***it is immaterial where in the chain of causation the explosion occurs***," further noting that "[e]very explosion is initiated by some primary event." *Id.* (emphasis added).

Likewise, every fire, fire department response, shower of debris, and emergency utility shutdown "is initiated by some primary event." The District Court should not have considered that primary event as the "cause" of the Losses in the absence of an anti-concurrent causation clause or similar language. Nor can the "pop" of molten material be considered the sole "primary event" causing the Losses.

It is undisputed that the "pop" was the result of rapid expansion of moisture left in the drain mold, likely from a tropical storm that passed through the night before the accident.[67] Allowing insurers to pick and choose the "cause" of a loss from a chain of events creates a perverse incentive for them to pick the cause that limits their liability, and is precisely why the Supreme Court of South Carolina and this Court have instructed that courts should first look to "the cause closest in time or place," *Valentine*, 131 F. App'x at 410 (citing *Lesley*, 199 S.E.2d at 85), and find coverage whenever there is a reasonable basis to do so, even if there is also a reasonable basis to deny coverage. *See, e.g.*, *Ward*, 257 F. App'x at 627 (vacating trial court's denial of summary judgment for insured because policy was susceptible to multiple reasonable interpretations).

3.  Even if the Molten Material Endorsement is Considered an Exclusion, It Can Reasonably Be Read to Not Apply to the Losses.

South Carolina courts use different causation standards when assessing exclusionary clauses versus insuring clauses. But even if the Court finds the MME is an exclusion, the District Court's determination that the Endorsement unambiguously applies must still be reversed. The South Carolina and Fourth Circuit cases where exclusionary clauses were found to bar coverage all involved very different language than the MME, a much more direct relationship between the

---

[67] JA225-229; JA996-1003; JA7956-7957.

excluded peril and the harm the insured suffered, or both. In addition, when the MME is read in context with other sections of the Policy—namely the insuring agreement and instructions for application of sublimits—it can reasonably be concluded that the MME does not apply to the Losses. No more is required for reversal.

As an initial matter, if the MME is considered an exclusionary clause, it must be narrowly drawn and construed strictly against Insurers. *See, e.g.*, *Cincinnati Ins.*, 395 F. Supp. 3d at 690-91 ("[I]nsurance policy exclusions are construed most strongly against the insurance company, which also bears the burden of establishing the exclusion's applicability." (internal citations omitted)). Where interpretation of an exclusion is at issue, courts applying South Carolina law have required an "'immediate and direct'" "nexus between the cause [excluded peril] and effect [insured's loss]." *Canopius*, 202 F. Supp. 3d at 547 (quoting *Berlin*, 2005 WL 7082978 at *3).[68] The MME can reasonably be read as inapplicable to the Losses under this causation standard.

---

[68] The Supreme Court of South Carolina has even required a causal connection between the excluded peril and the loss at issue where the exclusion contains no causation language at all. *See S.C. Ins. Guar. Ass'n v. Broach*, 291 S.C. 349, 350 (1987) (requiring insurer demonstrate connection between student pilot's flying and loss for student pilot exclusion to apply even though exclusion was phrased as blanket exclusion with no causation requirement).

First, there is no "immediate and direct" nexus between heat from molten material and the Losses. This is evident when comparing the undisputed facts of this case to *Valentine* and other cases finding policy exclusions barred coverage. In those cases, there was a much closer causal connection between the excluded peril and harm to the insured. *Valentine* found that an exclusion for "claim[s] arising out of the insolvency . . . of . . . any organization in which the INSURED . . . placed the funds of a client" in a professional liability policy issued to insurance brokers barred coverage for claims brought by the brokers' customers for selling insurance in a plan that became insolvent. 131 F. App'x at 407-08, 411. *Canopius* was similarly straightforward, finding an insurer did not have a duty to defend an insured nightclub against claims made by a patron who was shot at the club because the policy included an exclusion for "any claim and/or cause of action arising from: an assault and/or battery." 202 F. Supp. 3d at 544.[69]

Here, JWA's harm—damage from fire, debris, water, and utility shutdown— are much more attenuated from the excluded peril—heat from molten material— than the claims at issue in *Valentine* and *Canopius*, and any causal nexus is neither

---

[69] *Canopius* illustrates the established rules that "exclusionary clauses [are] to be narrowly interpreted" and that policy language "which is in any respect ambiguous or capable of two meanings must be construed in favor of the insured." 202 F. Supp. 3d at 546-47 (cleaned up). There, the court found that the exclusion for assault or battery *did not* apply to claims made by a separate patron who was accidentally shot, because construing the exclusion to remove the element of intent made sections of the policy redundant or meaningless. *Id.* at 551-53.

"immediate [nor] direct." *Canopius*, 202 F. Supp. 3d at 547. To the extent the Losses can be attributed to multiple causes, there is a much more immediate and direct nexus between the Losses and covered perils than heat from molten material. Moreover, if the Losses can reasonably be attributed to multiple causes, established principles of South Carolina law require the Court to adopt the construction most favorable to JWA. Had Insurers contemplated that the MME would limit coverage for damage that was the result of multiple causes, they should have included "directly or indirectly" language or an anti-concurrent causation clause, discussed above. *See Gulf Underwriters Ins. Co. v. KSI Svcs., Inc.*, 233 F. App'x 239, 241 (4th Cir. 2007) ("[P]olicy language excluding coverage for damages arising '*directly or indirectly*' out of criminal acts contemplates multiple causes of liability and does not restrict the exclusion's operation to circumstances in which the criminal act was the liability's *direct or sole cause* or even its proximate or primary cause." (emphases in original)).

Moreover, The MME's narrow language—"***direct*** physical loss or damage ***cause[d]*** by ***heat*** from Molten Material"[70]—must be construed more narrowly than the broad "arising from" language in the relevant exclusions in *Valentine* and other cases dealing with causation under exclusionary clauses. *See Valentine*, 202 F. Supp. 3d at 407-08 (interpreting exclusionary clause for "Any claim ***arising out***

---

[70] JA315 (emphases added).

*of . . .* insolvency" (emphasis added)); *Canopius,* 202 F. Supp. 3d at 544 (interpreting

exclusionary clause for "any claim and/or cause of action ***arising from***" assault or

battery (emphasis added)). Other Policy endorsements and exclusions use this broad

"arising from" language, but the MME does not.[71] The MME's narrower language

must be given some effect in interpreting the Policy.

Finally, if the MME is considered an exclusionary clause, it can reasonably

be read to not apply to the Losses for the additional reasons stated in Sections II.A

and II.B, *supra*.

### D.     JWA's Interpretation Would Cause the Policy to Comply with Law Applicable to Claims Made at Other Locations.

The Policy covers all of JWA's "Property Insured within the fifty (50) states

of the United States of America," including at specific "Named Locations."[72]

Among those Named Locations is JWA's facility in St. Louis, Missouri.[73]

Reflecting the multi-jurisdictional coverage provided, Condition T of the Policy,

entitled "Special State Requirements," states that any of the Policy's provisions

"in conflict with the statutes of the State wherein this Policy is applicable are

---

[71] *Compare* JA295 (excluding "Damage or Consequential loss directly or indirectly caused by, consisting of, or arising from" certain perils), *and* JA333 (excluding "loss, damage, cost, or expense of whatsoever nature directly or indirectly caused by, resulting from, or in connection with" certain perils), *with* JA315 (applying only to "direct physical loss or damage cause[d] by heat from Molten Material").

[72] JA266; JA312; JA349.

[73] JA312.

understood, declared, and acknowledged . . . to be amended to conform to such statutes."[74]

Missouri, like many states, has a "standard fire policy" statute that applies to insurance policies "carrying risks by fire or lightning," and sets a baseline for coverage by requiring that any such policy must, at minimum, entitle the insured to either (1) the actual cash value of the damaged property, or (2) the cost to repair or replace the damaged property.[75] Missouri courts have enforced this statute to void insurance provisions when their application "fails to provide coverage that is at least as favorable to the insured as the standard fire policy."[76]

Reading the MME to apply to the Losses would cause it to violate Missouri's standard fire policy statute. It is undisputed that JWA suffered property damage in excess of $10 million, due in part to fire. Application of the MME to all damage from the Losses would result in coverage less favorable than Missouri's standard fire policy, in contravention of state law. Notably, Policy exclusions that

---

[74] JA277.

[75] Missouri has adopted New York's standard fire insurance policy, with some modifications not relevant here. Mo. Code Regs. Ann. tit. 20, § 500-1.100(1) (adopting New York's standard fire policy); N.Y. Ins. Law § 3404(e) (New York standard fire policy). The statute applies to "[e]ach fire insurance company doing business in the state of Missouri." Mo. Ann. Stat. § 379.160.

[76] *Auto Club Fam. Ins. Co. v. Pack*, No. 1611-CC-0829, at *2 (Mo. 11th Jud. Cir. Jun. 26, 2018), *aff'd*, 582 S.W.3d 902 (Mo. Ct. App. 2019). A copy of the *Pack* trial court decision is provided at JA987–990 pursuant to Local Rule 32.1(b).

were intended to apply to ensuing losses specifically carve out "result[ing] . . .fire and . . . direct physical loss or damage to property insured . . . in any State . . . that . . . pursuant to the Standard Fire Policy . . . prohibits exclusions for [perils] that result in fire," evincing the parties' intent to comply with applicable standard fire policy statutes, including that of Missouri.[77] It is reasonable to conclude that the MME does not include such a carve-out because it was never intended to apply to an ensuing fire loss, only to heat damage.

Alternatively, the Policy can be read to amend the MME to comply with Missouri's standard fire policy statute. Condition T applies to "statutes of the State *wherein this Policy is applicable*."[78] "Applicable" is not defined in the policy, so we look to its common meaning: "Capable of being applied."[79] The Policy is capable of being applied in Missouri, and is thus applicable in Missouri. It follows that Condition T deems the MME—which, as applied to the Losses, violates Missouri's standard fire policy statute—as "amended to conform to such statutes" by carving out any ensuing fire loss from the MME sublimit.

---

[77] *See, e.g.*, JA272 (exception to nuclear radiation exclusion for "resulting" "direct loss by fire"); JA332 (exception to terrorism exclusion for resulting fire); JA333 (same).

[78] JA277 (emphasis added).

[79] *Applicable*, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=applicable (last visited June 3, 2024).

The District Court dismissed these arguments because the Policy is being applied to property located in South Carolina, not Missouri.[80] However, Condition T is not limited to apply only to the law governing a given claim (here, South Carolina), but rather the laws of all states "wherein the Policy is *applicable*"—capable of being applied. The Policy is applicable in Missouri, and the parties clearly intended the Policy to comply with Missouri law, including its standard fire policy.[81] Accordingly (1) the MME should be interpreted as not applying to a fire loss in the first instance, or (2) it should be deemed amended under Condition T to not apply to a fire loss to conform to applicable law.

## III. Latent Ambiguity Arises When Applying the Molten Material Endorsement to the Facts of the Losses.

Even if the Court determines that the Policy and MME are unambiguous on their face, reversal is still required because the Policy and MME can reasonably be interpreted in multiple ways when applied to the facts of the Losses and viewed in light of undisputed parol evidence.

---

[80] JA7980.

[81] To be clear, the Court need not apply Missouri law and find that the Policy in fact violates Missouri's standard fire policy. Rather, the fact that JWA's proffered interpretation would cause the Policy to comply with applicable law (where the Policy shows an express intent to comply with the laws of all states in which there is insured property) is further evidence that that interpretation is reasonable.

"A latent ambiguity exists when there is no defect arising on the face of the instrument, but arising when attempting to apply the words of the instrument to the object or subject described. *Beaufort Cnty Sch. Dist. v. United Nat'l Ins. Co.*, 392 S.C. 506, 526 (S.C. Ct. App. 2011) (citations omitted). "Interpretation of a policy with a latent ambiguity is for the jury." *Id.*; *see also Ward*, 257 F. App'x at 626 ("only *latent* ambiguities in an insurance policy are resolved by a jury" (emphasis in original)). For the reasons stated above, the Policy and MME are patently ambiguous. In addition, the Policy and MME are particularly ambiguous and unclear when applied to the Losses.

### A. The Molten Material Endorsement Can Reasonably Be Applied to JWA's Losses in Multiple Ways.

As applied to the Losses, the Policy's circular and contradictory terms, along with the absence of definitions of several key terms, makes the MME susceptible to multiple reasonable interpretations. What counts as one "Occurrence" when applied to the Losses? An Occurrence is defined as all losses arising from one "event," which is not defined in the Policy. Is the ejection of molten aluminum a single event, followed by the event of fire and falling debris, and so on? Or should this entire hours-long series of events, with distinct perils, distinct harms, and multiple decision points by the people involved, be considered one "event"?

In finding that the MME unambiguously applied, the District Court found that the Losses could be considered a single Occurrence because "the loss and series of losses sustained by JWA on August 4, 2020, arose out of and were caused by one event."[82] The District Court did not, however, perform any substantive analysis of the word "event." When applying the ordinary definition of "event" to the facts of the Losses, the different causal steps (and their unique attendant perils) can each reasonably be considered a separate "event," or a "phenomenon or occurrence located at a single point in spacetime." For instance, the initial release of molten material onto the beam can be considered one event, the fire on the beam a separate event, the roof catching fire another event, and so on. Moreover, these events—which did not necessarily lead to one another—caused distinct types of harm, all of which was harm from perils other than and very different from heat damage from molten material. If these separate causes of damage are considered separate "events," then they must necessarily be separate Occurrences, and therefore require a separate analysis and application of sublimits, including the MME.

Even if the Court finds that the Losses were caused by one "event," reversal is still required. In reaching its conclusion that the MME unambiguously applied, the District Court implicitly found that that endorsement applied to damages

---

[82] JA7982.

caused in any way by heat from molten material. However, in construing insuring clauses (which the District Court considered the MME to be), courts applying South Carolina law must find coverage if the cause closest in time or place is a peril insured. Here, heat from molten material was only the nearest efficient cause of minor heat damage to the support beam, and not the other forms of damage JWA suffered. In addition, as explained above, the MME does not contain anti-concurrent causation language present in other Policy sections, is narrowly drawn, and applies only to *direct* damage caused by *heat* from molten material, which is inherently hot.[83] Accordingly, the Policy can reasonably be read to apply to JWA's Losses in multiple ways, some of which would be more favorable to JWA than that adopted by the District Court.

## B. Extrinsic Evidence Demonstrates that the Policy Is Latently Ambiguous.

In evaluating whether an insurance policy contains a latent ambiguity, courts applying South Carolina law may look to "facts extrinsic and collateral to the policy . . . to explain the ambiguity and to show what was the subject of insurance." *Hastings v. Union Fire Ins. Co.*, 125 S.E. 923, 924 (S.C. 1924). Even if a "policy [i]s unambiguous upon its face … it does not at all follow that extrinsic circumstances may not develop a latent ambiguity." *Id.* Stated differently, "latent

---

[83] JA315 (emphases added).

ambiguity [may be] developed by facts extrinsic and collateral to the policy." *Id.*; *see also Maryland Cas. Co. v. Gaffney Mfg. Co.*, 76 S.E. 1089, 1090 (S.C. 1913) (latent ambiguity may be shown by "read[ing] [policy] in the light of the conditions and circumstances existing when it was issued").

The Policy is susceptible to multiple reasonable interpretations when read in light of undisputed parol evidence. As Insurers' underwriting guidelines acknowledge, ███████████████████████████ are ████████████ ████████ of the metals industry and a ████████████████████████[84]

Indeed, any significant loss, and particularly any fire loss, at JWA's facility was likely to involve molten material in some way. If the parties understood the MME to limit JWA's coverage for a likely "maximum probable loss scenario" to just $10 million (before applying the $1 million and $826,000 deductibles for property damage and business interruption, respectively),[85] surely JWA would have received a significant premium discount. But Insurers and their underwriters had no idea how the MME impacted JWA's premium.[86] Moreover, JWA paid a total premium of nearly $1 million for the Policy, which, at least theoretically, provided

---

[84] JA8110-8112.

[85] JA264.

[86] JA7628; JA7638-7639. In addition, Insurers' underwriting files—which they have represented contain all documents relevant in their underwriting decisions—make no mention of the MME. JA481; JA450.

$250 million of coverage.[87] It is not commercially reasonable for JWA—an insured with minimal loss history prior to the Losses[88]—to pay a premium amounting to roughly 10% of the coverage for its most likely maximum probable loss scenario.

That the parties never understood or intended the MME to apply to all damage resulting from the Losses can also be inferred from their conduct after JWA made its claim. Insurers did not raise and were not even aware of the MME until a third-party claims adjuster pointed it out more than seven weeks after the Losses.[89] The fact that Insurers took months to even identify an endorsement and sublimit that they now claim is entirely on point demonstrates that they did not have that understanding at the time of contracting, or at the very least that the MME can reasonably be read in multiple ways. No more is required for reversal.

## IV. JWA Did Not Reasonably Expect the Molten Material Endorsement to Apply to Ensuing Fire or Other Harms.

Reading the MME to not apply to the Losses also accords with JWA's reasonable expectations at the time it purchased the Policy. Courts applying South Carolina law "look to the reasonable expectations of the insured at the time when [they] entered into the contract if the terms thereof are ambiguous or conflicting,

---

[87] JA360.

[88] JA3148; JA7639.

[89] JA725-726; JA744.

*or* if the policy contains a hidden trap or pitfall, or if the fine print takes away that which has been given by the large print." *Bell*, 757 S.E.2d at 407 (emphasis added); *see also King v. N. River Ins. Co.*, 297 S.E.2d 637, 638 (S.C. 1982) (refusing to construe policy in way that would limit coverage and "in many instances defeat the purpose of insuring against" a peril). "[T]he reasonable expectations doctrine may apply in situations in which the policy's terms are, at least technically, unambiguous." *Canopius*, 202 F. Supp. 3d at 550-51 (collecting cases).

Here, the JWA executive responsible for procuring the Policy testified that he did not understand the Policy to limit coverage for fire ensuing from molten metal release and that such an interpretation would significantly reduce JWA's coverage (all without any premium discount).[90] At a minimum, this was competent evidence creating a genuine issue of material fact regarding JWA's reasonable expectations, and should have precluded summary judgment in favor of Insurers, even if the Policy was "at least technically, unambiguous." *Canopius*, 202 F. Supp. 3d at 550-52.

## CONCLUSION

For the foregoing reasons, the District Court's conclusion that the MME unambiguously applied to limit JWA's recovery for the Losses to $10 million must be reversed. The Court should find that the Policy and MME are ambiguous, either

---

[90] JA7619-7620.

on their face or as applied to the Losses, and/or that the District Court's interpretation does not accord with JWA's reasonable expectations, and remand the case to the District Court.

## STATEMENT REGARDING ORAL ARGUMENT

JWA respectfully requests that oral argument be permitted because the dispositive issues have not been authoritatively decided, the facts and legal arguments are adequately presented in this brief and the record, and the decisional process would be significantly aided by oral argument.

Dated: June 4, 2024

SUBMITTED BY:

*/s/ Craig Boneau*
Craig Boneau
Scott D. Saldaña
Dylan E. Jones
Morgan M. Menchaca
Julia Di Fiore
REID COLLINS & TSAI LLP
1301 S. Capital of Texas Hwy,
Ste. C300
Austin, TX 78746
Tel:   (512) 647-6100
cboneau@reidcollins.com
ssaldana@reidcollins.com
djones@reidcollins.com
mmenchaca@reidcollins.com
jdifiore@reidcollins.com

Beattie B. Ashmore
650 East Washington Street
Greenville, SC 29601
(864) 467-1001
Tel:   (864) 467-1001
Beattie@BeattieAshmore.com

*Attorneys for Plaintiff-Appellant JW Aluminum Company*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32(a)(7)(B) because this brief contains 12,676 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), which is within the 13,000-word limit for a principal brief under Local Rule 32(a)(7)B)(i).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ *Craig Boneau*
Craig Boneau

## CERTIFICATE OF SERVICE

I, Craig A. Boneau, certify that on June 4, 2024, I served a copy of this Redacted Appellant's Brief on counsel of record via this Court's CM/ECF electronic filing system:

BRIAN C. DUFFY
    HUNTER WINDHAM
    Duffy & Young, LLC
    96 Broad Street
    Charleston, SC 29401
    (843) 720-2044
    bduffy@duffyandyoung.com

    KEITH MOSKOWITZ
    DOUGLAS D. JANICIK
    CATHARINE LUO
    Dentons US LLP
    233 S. Wacker Drive, Ste. 5900
    Chicago, IL 60606-6361
    (312) 876-8220
    Keith.moskowitz@dentons.com

    *Counsel for Appellee*

                     /s/ *Craig A. Boneau*
                     Craig A. Boneau