# 24-1229

# United States Court of Appeals
### *for the*
# Fourth Circuit

JW ALUMINUM COMPANY,

*Plaintiff/Appellant,*

— v. —

ACE AMERICAN INSURANCE COMPANY; WESTPORT INSURANCE
CORPORATION; AIG SPECIALTY INSURANCE COMPANY; GENERAL
SECURITY INDEMNITY COMPANY OF ARIZONA,

*Defendants/Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA AT CHARLESTON

# REDACTED BRIEF OF APPELLEES

DUFFY & YOUNG, LLC

Brian C. Duffy
Hunter Windham
96 Broad Street
Charleston, SC 29401
(843) 720-2044

*Counsel for Appellees ACE American
Insurance Company, Westport Insurance
Corporation, and General Security
Indemnity Company of Arizona*

DENTONS US LLP

Keith Moskowitz
233 S. Wacker Drive, Suite 5900
Chicago, IL 60606-6361
(312) 876-8220

Catharine Luo
1900 K Street NW
Washington, DC 20006
(202) 496-7500

Douglas Janicik
2398 East Camelback Road #850
Phoenix, AZ 85016
(602) 508-3900

*Counsel for Appellee AIG Specialty
Insurance Company*

**DISCLOSURE STATEMENT**

In accordance with Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Defendants-Appellees make the following disclosures:

1.  ACE American Insurance Company is wholly owned by INA Holdings Corporation (DE), which is wholly owned by INA Financial Corporation (DE), which is owned by INA Corporation (PA), which is owned by Chubb INA Holdings, Inc. (DE), which is wholly owned by Chubb Group Holdings, Inc. (DE), which is wholly owned by Chubb Limited, a Switzerland corporation.

2.  Westport Insurance Corporation is wholly owned by SR Corporate Solutions America Holding Corporation. SR Corporate Solutions America Holding Corporation is wholly owned by Swiss Re Corporate Solutions Holding Company Ltd. Swiss Re Corporate Solutions Holding Company Ltd is wholly owned by Swiss Reinsurance Company Ltd. Swiss Reinsurance Company Ltd is wholly owned by Swiss Re Ltd, a publicly traded company listed in accordance with the International Reporting Standard on the SIX Swiss Exchange. No publicly traded company owns 10% or more of the stock of Swiss Re Ltd.

3.  AIG Specialty Insurance Company states that it is a direct, wholly-owned (100%) subsidiary of AIG Property Casualty U.S., Inc., which is a wholly-

owned (100%) subsidiary of AIG Property Casualty Inc., which is a wholly-owned (100%) subsidiary of American International Group, Inc., a publicly-held corporation. No parent entity or publicly held entity owns 10% or more of the stock of American International Group, Inc.

4.   General Security Indemnity Company of Arizona is a wholly owned subsidiary of SCOR US Corporation. SCOR US Corporation is a wholly owned subsidiary of SCOR SE, a publicly owned French company. SCOR SE is a publicly traded company on the Euronext Paris Stock Exchange. No other publicly held entity holds more than 10% interest in SCOR SE.

# TABLE OF CONTENTS

**Page**

INTRODUCTION .............................................................................1

STATEMENT OF JURISDICTION.....................................................4

STATEMENT OF THE ISSUE.............................................................4

STATEMENT OF THE CASE...............................................................4

I. JWA PURCHASES PROPERTY POLICIES WITH VARIOUS CONDITIONS AND SUBLIMITS ...............................................4

II. A RELEASE OF MOLTEN MATERIAL CAUSES A FIRE AND ADDITIONAL DAMAGE AT JWA'S FACILITY .......................7

III. JWA FILES A CLAIM WITH INSURERS AND DISPUTES OVER SEVERAL ISSUES LEAD TO LITIGATION .............................9

IV. THE DISTRICT COURT GRANTS SUMMARY JUDGMENT IN FAVOR OF INSURERS ...............................................9

SUMMARY OF ARGUMENT .........................................................11

STANDARD OF REVIEW ...............................................................14

ARGUMENT ....................................................................................15

I. THE DISTRICT COURT CORRECTLY DETERMINED THAT, AS A MATTER OF LAW, THE MME SUBLIMIT APPLIES TO ALL OF JWA'S LOSSES .......................................................17

    A. The Plain And Unambiguous Language Of The MME Sublimit And Condition M Cap JWA's Coverage At $10 Million ..................17

    B. JWA Cannot Manufacture An Ambiguity Out Of The Plain And Unambiguous Language Of The MME...............................19

        1. The MME Is Not Ambiguous Or Unclear Due To "Circular" Language Or Minor Typos......................................21

        2. The MME Is Not Unclear Or Ambiguous By Reference To Other Policy Provisions......................................23

C.    The District Court's Interpretation Of The MME Sublimit Does Not Render Any Policy Provision Superfluous ...................................25

D.    *Lesley*'s Coverage Analysis Does Not Apply .....................................28

      1.    This Court Should Reject JWA's Alternate Interpretations Of Condition M .................................................30

      2.    Anti-Concurrent Causation Clauses Are Irrelevant Here .........32

E.    Missouri's Standard Fire Policy Is Irrelevant To This Loss In South Carolina .....................................................................................34

II.    THE MME DOES NOT CONTAIN A LATENT AMBIGUITY OR RENDER COVERAGE ILLUSORY............................................................38

A.    There Is No Latent Ambiguity .............................................................38

B.    Extrinsic Evidence Does Not Save JWA's Unreasonable Application Of The MME Sublimit ....................................................40

III.    THE "REASONABLE EXPECTATIONS DOCTRINE" DOES NOT APPLY.......................................................................................................41

CONCLUSION .....................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AEI Life LLC v. Lincoln Benefit Life Co.*,
    892 F.3d 126 (2d Cir. 2018) ................................................................35

*Allstate Prop. & Cas. Ins. Co. v. English*,
    No. 4:16-3404-RBH-KDW, 2017 WL 11297114 (D.S.C. Nov. 20,
    2017) ....................................................................................................43

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)........................................................................ 14-15

*Beaufort Cnty. Sch. Dist. v. United Nat. Ins. Co.*,
    709 S.E.2d 85 (S.C. Ct. App. 2011) ...................................................16

*Bell v. Progressive Direct Ins. Co.*,
    757 S.E.2d 399 (S.C. 2014) .........................................................41, 42

*Bennett & Bennett Constr., Inc. v. Auto Owners Ins. Co.*,
    747 S.E.2d 426 (S.C. 2013) .........................................................19, 21

*Berry Road Partners, LLC v. Janearl, LLC*,
    No. C-08-CV-20-000585, 2022 WL 17843041 (Md. App. Ct. Dec.
    22, 2022) ..............................................................................................21

*Bouchat v. Baltimore Ravens Football Club, Inc.*,
    346 F.3d 514 (4th Cir. 2003) ..............................................................15

*C.A.N. Enters., Inc. v. S.C. Health & Human Servs. Fin. Comm'n*,
    373 S.E.2d 584 (S.C. 1988) .........................................................16, 31

*Canopius US Ins., Inc. v. Middleton*,
    202 F. Supp. 3d 540 (D.S.C. 2016) .....................................................42

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)............................................................................15

*Colony Ins. Co. v. Wright*,
    16 F.4th 1186 (5th Cir. 2021) .............................................................20

v

*Com. Union Ins. Co. v. Porter Hayden Co.*,
 698 A.2d 1167 (Md. Ct. Spec. App. 1997).......................................35

*DHW Purchasing Grp., LLC v. Hub Int'l Midwest Ltd.*,
 No. 3:19-cv-1243-CMC, 2019 WL 5700457 (D.S.C. Nov. 4, 2019)...........43, 44

*Garrett v. Pilot Life Ins. Co.*,
 128 S.E.2d 171 (S.C. 1962) .................................................16

*Gilstrap v. Culpepper*,
 320 S.E.2d 445 (S.C. 1984) .................................................16

*Gray v. State Farm Auto Ins. Co.*,
 491 S.E.2d 272 (S.C. Ct. App. 1997) .......................................15

*Jersey Insurance Co. of N.Y. v. Heffron*,
 242 F.2d 136 (4th Cir. 1957) ..............................................28

*Kelaher, Connell & Conner, P.C. v. Auto-Owners Ins. Co.*,
 440 F. Supp. 3d 520 (D.S.C. 2020) ......................................42-43

*King v. North River Ins. Co.*,
 297 S.E.2d 637 (S.C. 1982) .................................................28

*Lesley v. American Security Insurance Co.*,
 199 S.E.2d 82 (S.C. 1973) .......................................13, 28, 29, 33

*Muth v. U.S.*,
 1 F.3d 246 (4th Cir. 1993) ..............................................20, 38

*Nation v. First Tenn. Bank Nat'l Ass'n*,
 525 F. App'x 649 (10th Cir. 2013) .........................................20

*Nationwide Mut. Fire Ins. Co. v. Neetu, Inc.*,
 No. 3:09-cv-2703-CMC, 2010 WL 3927568 (D.S.C. Oct. 4, 2010) .............43

*New York Life Ins. Co. v. Smith*,
 38 S.E.2d 910 (S.C. 1946) ..................................................44

*OTG Mgmt. PHL LLC v. Emps. Ins. Co. of Wausau*,
 557 F. Supp. 3d 556 (D.N.J. 2021) .........................................33

*Quaker Hills, LLC v. Pac. Indem. Co.*,
  728 F.3d 171 (2d Cir. 2013) ............................................................37

*Rainbow Gun Club, Inc. v. Denbury Onshore, L.L.C.*,
  760 F.3d 405 (5th Cir. 2014) ..........................................................21

*Redmond v. Strange*,
  26 S.E.2d 16 (S.C. 1943) ................................................................44

*S.C. Farm Bur. Mut. Ins. Co. v. Berlin*,
  No. 2005-UP-062, 2005 WL 7082978 (S.C. Ct. App. Jan. 25,
  2005) ................................................................................................19

*Sangamo Weston, Inc. v. Nat'l Surety Corp.*,
  414 S.E.2d 127 (S.C. 1992) ............................................................34

*Schulmeyer v. State Farm Fire & Cas. Co.*,
  579 S.E.2d 132 (S.C. 2003) ............................................................16

*Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*,
  377 F.3d 408 (4th Cir. 2004) ..........................................................14

*Smith v. Coxe*,
  191 S.E. 422. (S.C. 1937) ..........................................................38, 39

*South Carolina Ins. Co. v. White*,
  390 S.E.2d 471 (S.C. Ct. App. 1990) ..............................................16

*Stevens Aviation, Inc. v. DynCorp Int'l LLC*,
  756 S.E.2d 148 (S.C. 2014) ............................................................34

*Stewart v. State Farm Mut. Auto. Ins. Co.*,
  533 S.E.2d 597 (S.C. Ct. App. 2000) ..............................................17

*Stone v. Liberty Mut. Ins. Co.*,
  105 F.3d 188 (4th Cir. 1997) ..........................................................14

*Sullivan Mgmt., LLC v. Fireman's Fund Ins. Co.*,
  879 S.E.2d 742 (S.C. 2022) ............................................................30

*Union Assur. Soc., Ltd., of London, England v. Miller*,
  29 F. Supp. 127 (W.D. Mo. 1928) ..................................................37

*Utica Mut. Ins. Co. v. Weathermark Invs., Inc.*,
   292 F.3d 77 (1st Cir. 2002)................................................................20

*Ward v. Dixie Nat. Life Ins. Co.*,
   257 F. App'x 620 (4th Cir. 2007) .....................................................38

*Wheeler v. Globe & Rutgers Fire Ins. Co.*,
   118 S.E. 609 (S.C. 1923) ..................................................................16

*Williams v. Homeowners of Am. Ins. Co.*,
   620 F. Supp. 3d 424 (D.S.C. 2022) ............................................. 32-33

*Yarborough v. Phoenix Mut. Life Ins. Co.*,
   225 S.E.2d 344 (S.C. 1976) ....................................................24, 38, 39

## Statutes & Other Authorities

43 Am. Jur.2d *Insurance* § 440 (2024)...................................................33

Mo. Stat. § 379.160(1) ........................................................................34, 36

S.C. Code § 38-61-10............................................................................34

Williston on Contracts, Rules of Interpretation § 32:9...........................22

**INTRODUCTION**

This case presents the straightforward application of a molten material sublimit in a property insurance policy to damage from an incident undisputedly precipitated by the accidental discharge of molten material. On August 4, 2020, a fire started at a JW Aluminum Company ("JWA") facility in South Carolina when molten metal "popped" out of a "mold" that employees were handling and landed on a steel beam supporting the roof; this ignited aluminum dust on the beam, and the fire spread onto the roof. JWA shut down its power and gas lines, which caused molten aluminum to "freeze," resulting in damage to equipment. Eventually, the fire department was able to extinguish the fire. There is no genuine issue over any of these material facts relating to the loss. The only issue presented by this case is the interpretation of the insurance contract as a matter of law.

Appellees, JWA's insurers (the "Insurers"), do not dispute that there was coverage for JWA's covered losses. The coverage, however, is subject to a $10 million sublimit pursuant to each insurer's respective molten material endorsement (the "MME").[1] The MME states: "this policy insures against direct physical loss or damage cause[d] by heat from Molten Material, which has been accidentally discharged from equipment, subject to a limit of $10,000,000 per occurrence." This

_____

[1] The parties agree that the provisions of the Insurers' Policies at issue here are identical. Appellant's Br. at 3 n.2. Citations herein are to the language from the ACE Policy (JA251-356).

1

is exactly what occurred in this instance. The Policies define "occurrence" as "any loss or series of losses arising out of one event, regardless of the number of locations affected." Moreover, each Policy includes a condition on sublimits like the one for "Molten Material"—"Condition M" states the sublimit "shall apply to all losses arising out of any one Occurrence," whether such losses include damage to real or personal property, business interruption loss, or both.

As the district court held, these provisions mean one thing: the $10 million cap applies to *all* losses that are caused by any loss or series of losses (such as the roof igniting, water damage from putting out the fire and damage to equipment from shutting down utilities) that are caused by "one event"—the discharge of molten material at the JWA facility on August 4, 2020. In other words, while there may have been a chain of events causing damage during this incident, all losses were caused by heat from the discharge of molten material. There were not, as JWA contends, multiple "occurrences" that took place after the discharge of molten material giving rise to separate claims outside of the application of the MME. Such a reading tortures the plain and unambiguous language of the Policies. And under South Carolina law, this Court cannot rewrite the Policies' terms to extend coverage beyond what the parties agreed to.

Tellingly, JWA's primary argument in the district court was not that the operative language was ambiguous; indeed, *JWA did not even mention Condition M*

*of the Policies*. JWA argued below that the MME sublimit cannot apply to a "fire loss" in light of South Carolina's "valued policy" law, which governs fire policies. The district court correctly rejected that argument, and on appeal JWA drops it. Instead, JWA makes new arguments on appeal, trying to manufacture an ambiguity where none exists. Those arguments were all waived and, in any event, go nowhere.

JWA also tries—again, for the first time on appeal—to inject extrinsic (and irrelevant) evidence into the analysis, claiming there is a "latent" ambiguity in the Policies' language. There is no "latent" ambiguity; what JWA is really trying to do is *create* an ambiguity using extrinsic evidence, which South Carolina law does not allow.

Finally, the "reasonable expectations doctrine" cannot override plain and unambiguous policy terms: as the district court made clear, a court's duty under South Carolina law is "limited to the interpretation of the contract made by the parties themselves."

For these reasons, and as shown further below, this Court should affirm the judgment of the District Court.

## STATEMENT OF JURISDICTION

Insurers agree with JWA's Statement of Jurisdiction in JWA's Opening Brief ("Appellant's Br.").

## STATEMENT OF THE ISSUE

In interpreting the Policies' Molten Material sublimit, did the district court correctly determine that $10 million was the coverage limit when the sublimit capped coverage at that amount for a "series of losses arising out of one event," and it was undisputed that all losses were set in motion by the discharge of molten material on August 4, 2020?

## STATEMENT OF THE CASE

### I. JWA Purchases Property Policies With Various Conditions And Sublimits

JWA owns and operates facilities and equipment for the melting, processing, and finishing of aluminum.[2] A sophisticated entity, JWA is owned by four multibillion-dollar institutional investment funds: Goldman Sachs, Pentwater Capital Management, Magnetar Capital, and Kohlberg Kravis Roberts.[3] Further, JWA was represented by a leading insurance broker and risk advisor, Marsh USA Inc., to engage the market and obtain the insurance coverage JWA sought.[4] Marsh's

---

[2] JA128.
[3] *See* JA3068; see also JA4471–4472 (Brant Dep. 68:17-69:9); JA7482–7483 (Ex. 3, Cavatoni Dep. 168:20–169:18).
[4] JA2551, 2560–2561, 2579–2580.

4

representation of JWA included "negotiating and procuring the insurance and putting that insurance coverage in place."[5] As established before the district court, "it can hardly be said that the parties bargained from unequal positions of power" as Marsh is "the largest insurance broker in the world."[6] Moreover, JWA has acknowledged that itself, Marsh, and the Insurers were "all sophisticated actors."[7]

Insurers issued four separate all-risk insurance Policies to cover JWA's facilities.[8] The Policies provided coverage for losses to JWA's real and personal property unless specifically excluded.[9] The Policies also provided coverage for "physical loss or damage" from all perils other than those specifically excluded.[10] The Policy's Insuring Agreement states:

> A. Perils Insured
>
> This policy insures against all risks of direct physical loss or damage to Property insured from perils not otherwise excluded, subject to the terms and conditions of this policy.
>
> **In the event of such direct physical loss or damage to any Property Insured at the Premises Described in the Declarations, and such damage, without the intervention of any other independent cause, results in a sequence of events which causes physical damage to**

---

[5] JA2580 (Shipper Dep. 17:3–7).
[6] JA3528.
[7] JA152.
[8] JA252–356 (ACE Policy); JA2712–2807 (GSINDA Policy); JA2808–2912 (Westport Policy); and JA2913–3028 (AIG Specialty Policy).
[9] *Id.*
[10] JA266.

**other Property insured by this policy, then this policy will cover such resulting loss or damage**. Nothing in this clause shall be deemed to extend this insurance to property which is otherwise specifically excluded from coverages by the terms of this policy.[11]

The Policies included endorsements that specify events and circumstances that modify the basic coverage terms.[12] One such endorsement, the MME, provides:

It is hereby understood and agreed this policy does insure against direct physical loss or damage cause [sic] by heat from Molten Material, which has been accidentally discharged from equipment, subject to a limit of $10,000,000 per occurrence. . .[13]

Certain conditions aid in the interpretation of the Policies.[14] For example, Condition M, which applies specifically to "Limits and Sublimits of Liability," states as follows:

This policy may contain Sublimits of Liability applicable to specific coverages, specific causes of loss, specific kinds of loss, or specific locations. Any applicable sublimits are set forth in the Declarations. The Company shall not be liable for more than the amount of the Sublimit of Liability for any coverage for which there is a Sublimit of Liability specified in the Declarations. Each Sublimit of Liability shown in the Declarations is a part of, but is not in addition to, the Policy Limit of Liability. The Sublimit of Liability specified in the Declarations as applicable to a specific cause of loss shall apply to all losses arising out

---

[11] *Id.* (Emphasis added.)

[12] *See generally* JA301–317.

[13] JA315; *see also* JA262–263 (setting forth, in the Policies' Declarations pages, the amount $10,000,000 as the sublimit for coverage for "Molten Material Damage").

[14] *See generally* JA274–279.

of any one Occurrence, whether such losses include damage to real or personal property, Time Element loss (if such coverage is separately endorsed hereon), or both.

EXAMPLES:
(1) Assume the policy contains a Time Element sublimit of $20,000,000 and a Flood sublimit of $5,000,000. A flood occurs, and the Insured sustains a property damage loss of $10,000,000 and a Business Interruption (Time Element) loss of $10,000,000. The Insured can recover only $5,000,000 (total for both the property damage and for the Time Element losses) because the applicable Sublimit of Liability for Flood is $5,000,000.[15]

The term "Occurrence" is defined in the Policies as "any loss or series of losses arising out of one event, regardless of the number of locations affected."[16]

## II. A Release Of Molten Material Causes A Fire And Additional Damage At JWA's Facility

JWA's claims in this case were caused by heat from the discharge of molten material at a facility in South Carolina, resulting in fire and other damage to its property and disruption to its business operations (the "Molten Material Event").[17] On August 4, 2020, two JWA employees were performing routine maintenance on a holding furnace for molten aluminum at one of JWA's facilities.[18] The employees were draining the molten aluminum out of the holding furnace into a spot mold when

---

[15] JA275–276.
[16] JA280.
[17] JA134.
[18] JA36 (Compl. ¶ 21).

molten material popped out of the mold.[19] The molten material landed on a steel beam, also referred to as a purlin, and the heat from the molten aluminum caused dust on the beam to ignite.[20] The fire spread down the beam, and the heat then ignited the fiberglass roofing, resulting in a roof fire and falling debris.[21] In response, personnel at the facility initiated an emergency shutdown of the gas and electrical lines, resulting in an unintended solidification of molten aluminum in the furnaces that damaged equipment.[22] Once on the scene, the fire department used water to extinguish the fires, which led to water damage.[23]

It is undisputed that the cause of the fire at JWA's facility, which led to the chain of other events, was heat from the discharge of molten material.[24] JWA's fire investigator expert, Jason A. Sutula, completed an investigation and review of all available data, and he determined "molten aluminum splatter, which led to the ignition of the aluminum dust . . . is the most probable cause of the fire."[25] JWA's other expert, Ben Nolan, reached the same conclusion: "[N]othing came to my mind other than the splash of aluminum up in the ceiling that caused this fire. So I believe

---

[19] *Id.*
[20] *Id.*
[21] JA135.
[22] JA39 (Compl. ¶¶ 32, 34–35).
[23] *Id.* (Compl. ¶ 33).
[24] *See, e.g.*, JA996 (Sutula Report); JA5781 (Nolan Dep. 97:3–98:21).
[25] JA996 (Sutula Report).

by reading through the facts, that there were no other, that I could tell, independent or other causes of that particular fire at that location."[26]

## III. JWA Files a Claim with Insurers And Disputes Over Several Issues Lead to Litigation

Following the Molten Material Event, JWA submitted a fire damage claim to Insurers under the Policies for the losses it suffered from the fire caused by heat from the discharge of molten material.[27] Based on the MME, AIG and Westport made partial payments to JWA based on their respective shares of the $10 million sublimit.[28] Westport, ACE and GSINDA sought further information from JWA regarding equipment that was damaged at the facilities.[29] On April 7, 2021, JWA filed the underlying action against Insurers, bringing claims for declaratory judgment, breach of contract, and bad faith, with the intention of compelling coverage under the Policies.[30]

## IV. The District Court Grants Summary Judgment In Favor Of Insurers

JWA and Insurers filed cross-motions for summary judgment on JWA's coverage claim, which contained several issues that are not on appeal.[31] Following the district court's entry of its Opinion and Order on the several motions,[32] the parties

---

[26] JA5781 (Nolan Dep. 97:3–98:21).
[27] JA41.
[28] JA139.
[29] JA5170–5173.
[30] JA32.
[31] JA124; JA2426–3489.
[32] JA7948–8014.

reached a settlement of the remaining issues and moved the Court for entry of an agreed-upon final judgment.[33] The joint stipulation left as the sole issue on appeal the district court's finding that the MME limits JWA to $10 million in coverage for the damage that ensued from the discharge of molten material at its facility.[34]

Before the district court, Insurers contended that the amount recoverable for JWA's entire claim should be limited to $10 million based on the MME sublimit.[35] JWA disputed the applicability of the MME sublimit to its claim.[36] JWA presented only three arguments in support of its position that the $10 million MME sublimit does not apply to its claim.[37] First, JWA argued that it is entitled to recover the actual amount of the loss under South Carolina's valued policy law;[38] tellingly, JWA has dropped this primary argument on appeal.[39] Second, JWA argued that the sublimit does not apply because the MME must carve-out fire losses in order to abide by Missouri's standard fire policy.[40] Third, JWA sought to differentiate between heat and fire, contending that the plain language of the MME permits claimants to

---

[33] *See* JA8015–8017 (Joint Stipulation of Partial Dismissal with Prejudice); JA8018–8025 (Joint Motion for Entry of Agreed Final Judgment); JA8026–8028 (Order and Agreed Final Judgment).
[34] *Id.*
[35] JA2453–2456; *see also* JA5554–5562.
[36] JA159.
[37] JA158–172.
[38] JA161–162.
[39] JA160.
[40] JA165.

distinguish between damage attributable to heat from molten metal and damage stemming from other causes, such as fire.[41]

The district court rejected all three of JWA's arguments and held that the $10 million MME sublimit applies to JWA's entire claim for physical damages and business interruption losses.[42] The district court found that "the $10 million sublimit applies because the loss and series of losses sustained by JWA on August 4, 2020, arose out of and were caused by one event: the accidental discharge of molten metal up on the ceiling's I-beam causing a fire through the chemical reaction of the molten material's heat igniting combustible dust on the I-beam."[43] The district court held that, "[p]ursuant to the Policies' plain terms and conditions, the sublimit of liability—here, the $10 million cap—'shall apply to all losses or series of losses arising out of any one Occurrence.'"[44] "Any contrary conclusion would ignore the plain and unambiguous language of the Policies and result in an improper extension of Insurers' liability."[45]

## SUMMARY OF ARGUMENT

This Court should affirm the district court's grant of summary judgment in favor of the Insurers. JWA and its experts have admitted that "heat" from a small

---

[41] JA167.
[42] JA7948.
[43] JA7982–7983.
[44] JA7982.
[45] JA7983.

drop of molten metal set off a "chain of events" at its facility, which then caused damage through fire, water, falling debris, and utility shutdown. Applying the plain and unambiguous language of the MME and Condition M in JWA's Policies, the district court concluded that the $10 million sublimit of liability for loss from molten material "shall apply to *all* losses or *series* of losses arising out of any one Occurrence."[46] The Policies define "occurrence" as "any loss or series of losses arising out of one event, regardless of the number of locations affected." Thus, JWA's "series of losses" is, by definition, *one* "Occurrence"; as the district court correctly found, JWA's losses arose out of *one* event—an accidental discharge of molten material from JWA's equipment. The proper reading of the Policies is that straightforward.

Remarkably, on appeal, JWA has dropped its primary argument to the district court—that the MME cannot apply to a "fire loss" without violating South Carolina's "valued policy" law—effectively conceding that its prior argument was meritless. Instead, JWA now argues for the first time that the MME and Condition M are unclear or ambiguous due to "circular" language, minor typos that do not affect the Policies' meaning, or reference to the Policies' "Earth Movement or Flood" sublimit or Perils Insured provisions (both of which support the Insurers'

---

[46] JA7982 (quotations omitted and emphasis added).

reading of the policy). Those arguments are waived because they are raised for the first time on appeal and are also meritless.

JWA's other arguments should also be rejected. First, given the clear terms of Condition M, the application of the MME to JWA's entire loss does not nullify the meaning of "heat" within the MME; so long as "heat from Molten Material" sets off JWA's "series of losses"—as it undisputedly did here—the MME sublimit applies. The clear terms of Condition M also moot the need for the additional "directly or indirectly" verbiage suggested by JWA.

Second, Condition M governs the causation standard in this case, and thus the separate causation standard set out in *Lesley v. American Security Insurance Co.*, 199 S.E.2d 82 (S.C. 1973) is inapposite. *Lesley* concerns the proper causation standard to apply to whether coverage has been triggered under an insuring provision under a named peril policy; JWA's policy is an all-risk policy and coverage is undisputed. In sum, applying the *Lesley* standard to the MME is not required under South Carolina law and would violate the plain terms of Condition M.

Third, Missouri's standard fire policy clearly does not apply to a case governed by South Carolina law for a South Carolina loss. In fact, the Missouri standard fire policy itself makes clear that it applies only to policies "issued in" Missouri (the Policies were issued in South Carolina). Even if the Missouri standard fire policy did apply, it would not void the MME because it expressly allows the

parties to agree to insure the property for an amount lower than the actual or replacement value of the property.

Finally, JWA's attempts to create a "latent" ambiguity or claim a violation of its "reasonable expectations" by reference to extrinsic evidence cannot be allowed in light of the Policies' clear and unambiguous terms. Moreover, the extrinsic evidence cited by JWA is inapposite at best.

At bottom, an ambiguity is created *only* when two reasonable interpretations exist. The district court correctly determined that the Insurers' interpretation of the MME and Condition M was the only reasonable interpretation. JWA's attempts to introduce brand new policy arguments on appeal and to repackage no fewer than five different, disconnected, and fatally weak theories of interpretation only serve to highlight the unreasonableness of JWA's position, which this Court should reject.

## STANDARD OF REVIEW

The district court's summary judgment order is reviewed de novo. *Seabulk Offshore, Ltd. v. Am. Home Assur. Co*., 377 F.3d 408, 418 (4th Cir. 2004). Matters of contract interpretation are also reviewed de novo. *Id.*

Although the Court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 252 (1986); *Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997).

A "party opposing a properly supported motion for summary judgment . . . must 'set

forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v.

Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quotations

omitted).

When the party moving for summary judgment does not bear the ultimate

burden of persuasion at trial, it may discharge its burden by demonstrating to the

court that there is an absence of evidence to support the nonmoving party's case.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The non-movant must then

"make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." *Id.* at

322.

## ARGUMENT

Under South Carolina's settled principles of contract interpretation, the

district court correctly applied the MME and Condition M to cap JWA's losses at

$10 million. "In interpreting contracts, the foremost rule is to give effect to the intent

of the parties, and in doing so, the court looks to the language of the contract." *Gray

v. State Farm Auto Ins. Co.*, 491 S.E.2d 272, 274 (S.C. Ct. App. 1997). Where, as

here, "there is no ambiguity, contracts of insurance, like other contracts, must be

construed according to the terms which the parties have used, to be taken and

understood in their plain, ordinary and popular sense." *Garrett v. Pilot Life Ins. Co.*, 128 S.E.2d 171, 174 (S.C. 1962).

The Court's duty is "limited to the interpretation of the contract made by the parties themselves," *C.A.N. Enters., Inc. v. S.C. Health & Human Servs. Fin. Comm'n*, 373 S.E.2d 584, 587 (S.C. 1988), "regardless of its wisdom or folly, apparent unreasonableness, or failure to guard their rights carefully." *Gilstrap v. Culpepper*, 320 S.E.2d 445, 447 (S.C. 1984). Ultimately, it is the parties who have the "right to construct their own contract without interference from courts to rewrite or torture the meaning of the policy to extend coverage." *Schulmeyer v. State Farm Fire & Cas. Co.*, 579 S.E.2d 132, 134 (S.C. 2003); *see also South Carolina Ins. Co. v. White*, 390 S.E.2d 471, 474 (S.C. Ct. App. 1990) (noting insurer obligations "cannot be enlarged by judicial construction").

Where, as here, "the contract is clear, unambiguous and free from doubt," its construction "presents a question of law for the Court." *Garrett*, 128 S.E.2d at 174–75; *see also Wheeler v. Globe & Rutgers Fire Ins. Co.*, 118 S.E. 609, 610 (S.C. 1923) ("[a]s a general rule, contracts are to be construed by the court"). Thus, "[e]xtrinsic evidence may ***not*** be used to create an ambiguity in an otherwise unambiguous policy." *Beaufort Cnty. Sch. Dist. v. United Nat. Ins. Co.*, 709 S.E.2d 85 (S.C. Ct. App. 2011) (emphasis added) (citing *Yarborough v. Phoenix Mut. Life Ins. Co.*, 225 S.E.2d 344, 348 (S.C. 1976)).

## I. The District Court Correctly Determined That, As A Matter Of Law, The MME Sublimit Applies To All Of JWA's Losses

### A. The Plain And Unambiguous Language Of The MME Sublimit And Condition M Cap JWA's Coverage At $10 Million

The district court correctly held that, "[p]ursuant to the Policies' plain terms and conditions, the sublimit of liability—here, the $10 million cap—'shall apply to all losses or series of losses arising out of any one Occurrence.'"[47] "Consequently," the district court found that "the $10 million sublimit applies because the loss and series of losses sustained by JWA on August 4, 2020, arose out of and were caused by one event: the accidental discharge of molten metal up on the ceiling's I-beam causing a fire through the chemical reaction of the molten material's heat igniting combustible dust on the I-beam."[48] "Any contrary conclusion would ignore the plain and unambiguous language of the Policies and result in an improper extension of Insurers' liability."[49] The district court got it exactly right.

Reading the Policies as a whole,[50] the MME sublimit clearly applies to all damage whether it is categorized as fire, water, falling debris, or damage from the

---

[47] JA7982.

[48] JA7982–7983.

[49] JA7983.

[50] *Stewart v. State Farm Mut. Auto. Ins. Co.*, 533 S.E.2d 597, 601 (S.C. Ct. App. 2000) (rejecting "attempt[] [at] an artificial construction of the policy"; policy "must be read as a whole, and the court will not read the clause in isolation").

utility shutdown because it is undisputed[51] that those losses arose[52] from <u>one event</u> when a small discharge of "molten material" set off, in JWA's words, a "chain of events."[53] These different forms of damage all fall under the umbrella of "direct physical loss or damage cause[d] by heat from Molten Material, which [was] accidentally discharged from equipment" as set forth in the MME. As JWA's experts opined, a discharge of molten material set forth the chain of events that included the fire, water, falling debris, and utility shutdown.[54] The number of separate "events" in the "chain of events" that resulted in JWA's losses is irrelevant.

As Condition M lays out, any sublimit "applicable to a specific cause of loss shall apply to *all losses arising out of any one Occurrence*."[55] Thus the MME sublimit applies to limit coverage for all losses arising out of the discharge of the

---

[51] JWA's suggestion that its losses were "distinct losses" which "did not necessarily lead to one another" was never raised before the district court and should not be considered on appeal. Notably, in response to this molten material incident, JWA submitted one claim for coverage; it did not submit to Insurers separate claims for coverage for each of the "losses" it now characterizes as "distinct."
[52] JA315.
[53] Appellant's Br. at 1, 2, & 39. The Policies define the term "Time Element" as "any and all loss due to the interruption of the Insured's normal business operations, including, but not limited to, business interruption, extra expense, loss of rental income, and other similar economic losses . . . ." Thus, the MME sublimit applies to all the monetary damages JWA seeks in its lawsuit.
[54] JA3327 & JA3723.
[55] JA275 (emphasis added).

molten material, regardless of the form the loss takes.[56] And the definition of "Occurrence" confirms this interpretation because the term "occurrence" means "any loss or series of losses arising out of *one event*."[57] Here, the one event was the discharge of molten material, which led to fire damage, water damage, damage from falling debris, and damage from a shutdown of utilities. Although each of these damages, can be characterized differently from the other, they all arise out of the single event that is the discharge of molten material. Therefore, the MME sublimit applies and limits coverage for JWA's claim to $10 million.

**B.      JWA Cannot Manufacture An Ambiguity Out Of The Plain And Unambiguous Language Of The MME**

For the first time on appeal, JWA attempts to argue that the MME is ambiguous because "the relevant Policy sections are circular, unclear, and inconsistent" by reference to the terms of the MME and Condition M themselves or by reference to other policy provisions.[58] JWA has waived these arguments by not raising them below.

---

[56] "[A]rising out of" certainly means "caused by." *S.C. Farm Bur. Mut. Ins. Co. v. Berlin*, No. 2005-UP-062, 2005 WL 7082978, at *2 (S.C. Ct. App. Jan. 25, 2005); *see also Bennett & Bennett Constr., Inc. v. Auto Owners Ins. Co*., 747 S.E.2d 426, 428 (S.C. 2013) ("When policy language is undefined, courts must give it its plain, ordinary, and popular meaning.").
[57] JA280 (emphasis added).
[58] Appellant's Br. at 6–11 & 13–23.

"As this court has repeatedly held, issues raised for the first time on appeal generally will not be considered." *Muth v. U.S.*, 1 F.3d 246, 250 (4th Cir. 1993) (new theory raised on appeal of grant of summary judgment was waived even under *de novo* review). And this rule applies equally to new theories on appeal involving contract interpretation. *See, e.g.*, *Nation v. First Tenn. Bank Nat'l Ass'n*, 525 F. App'x 649, 651 (10th Cir. 2013) (insured's "new legal theory regarding interpretation of the [Policy] was forfeited when he failed to raise it in the district court"; "We decline this invitation to reverse the district court on a ground never presented to it."); *Utica Mut. Ins. Co. v. Weathermark Invs., Inc.*, 292 F.3d 77, 82 (1st Cir. 2002) (refusing to consider plaintiff's alternative argument for interpreting insurance contract; "although the court of appeals affords de novo review to order granting summary judgment, it will not reverse such an order on the basis of arguments that were not made in the trial court") (quotations omitted); *Colony Ins. Co. v. Wright*, 16 F.4th 1186, 1189 n.1 (5th Cir. 2021) (finding forfeiture where party pointed to a new clause in insurance policy to support its previously-raised position that there was coverage; "arguments not raised before the district court are waived and cannot be raised for the first time on appeal") (quotations omitted). Notwithstanding the foregoing, Insurers take this opportunity to respond to the arguments made by JWA.

1.   **The MME Is Not Ambiguous Or Unclear Due To "Circular" Language Or Minor Typos**

Even if the Court were to consider JWA's new attempts to find ambiguity within the terms of the MME and Condition M themselves, those attempts fail.

First, JWA argues that "[r]ead together," Condition M and the definition of "Occurrence" are "circular and susceptible to multiple reasonable interpretations" because those provisions state that "a sublimit applicable to a specific cause of loss shall apply to ***all losses arising out of any loss or series of losses*** arising out of one event."[59] Not true.

The repetition of the word "loss" does not make the definition of "Condition M" circular; it underscores that the sublimit applies to the entire series of losses that arose out of the Molten Material Event. Moreover, the definition of the word "Occurrence" as "any loss or series of losses arising out of one <u>event</u>"[60] does not "circularly" refer back to the term "Occurrence" itself, even if one defines "event" as "something that takes place, especially a significant occurrence" or "a

---

[59] Appellant's Br. at 15 (emphasis in original).

[60] Because it is undefined, the term "event" is construed according to its ordinary meaning. *Auto Owners Ins. Co.*, 747 S.E.2d at 428. "The word 'event' is also popularly understood to mean 'something that happens.'" *Berry Road Partners, LLC v. Janearl, LLC*, No. C-08-CV-20-000585, 2022 WL 17843041, at *7 (Md. App. Ct. Dec. 22, 2022) (quoting Merriam-Webster.com Dictionary); *see also Rainbow Gun Club, Inc. v. Denbury Onshore, L.L.C.*, 760 F.3d 405, 409 (5th Cir. 2014) ("popular" meaning of "event" is "'something that takes place'") (quoting American Heritage Dictionary of the English Language 615 (5th ed. 2011).

phenomenon or occurrence located at a single point in spacetime."[61] Rather, the term "Occurrence" under the Policy refers not just to "something that takes place" but refers to "*any losses or series of losses arising out*" of one event or "thing that takes place." The inclusion of the "losses or series of losses arising out of" in the definition of "Occurrence" is critical because it links all the losses arising out of an "Occurrence" with the common definition of "event" for purposes of determining insurance coverage.

Second, JWA's new attempts to cast the MME as "defective" based on minor typos further highlight that JWA grasps at straws to create an ambiguity. It is of no moment that "Molten Material" is capitalized in the MME but not defined, that "direct physical loss or damage cause[d] by heat from Molten Material" should have been written in the past tense, or that the title of the MME is only referred to as "Water, Liquid, Power of Molten Material Damage" in the Policy's Declaration section but not the MME itself.[62] JWA does not and cannot explain how any of these typos or inconsistencies affect the interpretation of the MME because they do not. *See, e.g.*, Williston on Contracts, Rules of Interpretation § 32:9 ("[A] court will disregard both grammatical constructs and the punctuation used in the written agreement when the context of the contract shows that grammatical or punctuation

---

[61] Appellant's Br. at 17–18 citing Event, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=event (last visited June 3, 2024).

[62] Appellant's Br. at 25 (citing to JA315 & JA263).

errors have occurred.") (citing numerous cases). These types of grammatical errors do not create any ambiguity. Rather, an ambiguity is *only* created when two reasonable interpretations exist. The district court agreed that the Insurers' interpretation was the only reasonable interpretation. Here, JWA fails to provide any reasonable alternate reading of the MME.

## 2. The MME Is Not Unclear Or Ambiguous By Reference To Other Policy Provisions

Similarly, even if they had not been waived, JWA's new attempts to construe the MME as ambiguous by reference to other provisions fail.

First, the separate definition of "Occurrence" for the Policies' "Earth Movement or Flood" coverage limits does not help JWA. As the district court noted, Condition M specifically excludes from the Earth Movement and Flood Sublimits only "fire or explosion which occur as a direct result," and the fact that similar language could have been but was not included with respect to the MME further supports the application of the MME sublimit to all JWA's losses.[63] Moreover, contrary to JWA's argument,[64] the definition of "Occurrence" for the Policies' "Earth Movement or Flood" coverage limits—"the sum total of all of the losses sustained by the Insured as the result of damage from Earth Movement or Flood which arise during a continuous period of seventy-two (72) hours"—is not

---

[63] Appellant's Br. at 30 & 34.
[64] Appellant's Br. at 19.

substantively different than the definition of "Occurrence" for all other limits, other than the fact that the losses for Earth Movement or Flood contain a unique temporal cutoff.[65]

Next, JWA argues that the Policies' "Perils Insured" section supports its position that "each link in a causal chain can reasonably be considered a separate 'event' . . . where those links involve distinct perils."[66] This argument fails because it ignores the plain language of Condition M, which applies sublimits to "all losses arising out of any one Occurrence." *See Yarborough v. Phoenix Mut. Life Ins. Co.*, 225 S.E.2d 344, 348 (1976) ("It is well settled that in construing an insurance contract, all of its provisions should be considered, and one may not, by pointing out a single sentence or clause, create an ambiguity.").

Although it is unnecessary to look outside the MME, Condition M, and the definition of "Occurrence" to understand how to apply the MME sublimit, the structure of the "Perils Insured" section is consistent with the definition of "Occurrence," which groups all "losses or series of losses" tied to a single "event" together for determining the application of a sublimit, by similarly considering an entire "sequence of events which causes physical damage to other Property Insured by this policy" for purposes of determining coverage:

---

[65] JA280.
[66] Appellant's Br. at 21 (referencing fire, water, electrical shutdowns).

> In the event of such direct physical loss or damage to any Property Insured . . . any such damage, without the intervention of any other independent cause, *results in a sequence of events which causes physical damage to other Property Insured by this policy*, then the policy will cover such resulting loss or damage.[67]

## C. The District Court's Interpretation Of The MME Sublimit Does Not Render Any Policy Provision Superfluous

Upholding the clear terms of Condition M, which requires the MME sublimit to be applied to "all losses arising out of any one Occurrence," does not render any of the Policies' provisions "superfluous."[68]

First, the district court's interpretation of the MME does not nullify the meaning of "heat" within the MME, which insure[s] against direct physical loss or damage cause[d] by heat from Molten Material, which has been accidentally discharged from equipment, subject to a limit of $10,000,000 per occurrence."[69] There is no basis for JWA's argument that "heat" must be "construed as limiting the type of damage that would be subject to the [MME's] cap."[70] Rather, so long as "heat from Molten Material" that "has been accidentally discharged from equipment" causes a loss or series of losses, coverage for that entire chain of losses—

---

[67] JA266 (emphasis added).
[68] JA275 (emphasis added).
[69] JA315 (emphasis added).
[70] Appellant's Br. at 27.

not just the "minor heat damage to the support beam"[71] is clearly and unambiguously limited at $10,000,000 pursuant to Condition M.

To the contrary, use of the term "heat" provides a broader scope for the sublimit than would "fire" and eliminates or simplifies an analysis of the origin. In fact, JWA acknowledged in its Complaint that "heat" is one of the "necessary elements" for fire.[72] There was no need to include the word "fire" in the MME sublimit.[73] If fire loss is "caused by heat from Molten Material," that loss is capped by the MME sublimit. And fire and heat from the discharge of molten material are not separate "Occurrences" so long as they arise from the same molten material "event." Tellingly, as the district court noted, the parties specifically carved out from Condition M "fire or explosion which occur as a direct result of a Flood or Earth Movement" (a different sublimit), indicating the parties' intent that fire was otherwise *included* within Condition M's aggregation of all losses arising out of any one Occurrence."[74]

---

[71] Appellant's Br. at 29.

[72] JA37 (Compl. ¶ 28-29).

[73] Appellant's Br. at 26-27.

[74] JA7980-7981. Contrary to JWA's argument, Appellant's Br. at 19, the definition of "Occurrence" for the Policies' "Earth Movement or Flood" coverage limits is not substantively different than the definition of "Occurrence" for all other limits, save one exception not relevant here: the former definition includes a temporal cut-off (JA180 ("the sum total of all the losses . . . as the result of damage from Earth Movement or Flood which arise *during a continuous period of seventy-two (72) hours*") (emphasis added)), while the latter does not (JA280 ("any loss or series of losses arising out of one event, regardless of the number of locations affected")).

Second, JWA argues that the district court's interpretation of the MME sublimit renders the phrase "directly or indirectly" meaningless in other provisions, because the district court essentially read the MME to state that it "insures against direct physical loss or damage ***directly or indirectly*** caused by heat from Molten Material, which has been accidentally discharged from equipment" when those words do not appear in the MME. Not so. It was not necessary for the Court to read the words "directly or indirectly" into the MME given the clear language in Condition M, which specifies that the MME sublimit applies to all losses "arising out of any one Occurrence." Moreover, the MME sublimit does cap at $10 million "*direct* physical loss or damage caused by heat from Molten Material."[75] As JWA acknowledges, "direct" means "proceeding … without deviation or interruption," or "immediate or proximate as distinguished from remote."[76] All the losses JWA claims here—fire damage, water damage, losses from utility shutdowns—meet that definition; none of them can fairly be described as *indirectly* caused by the discharge of molten material on the I-beam.

Finally, the different "expansive" language in the Policies' Total Terrorism Exclusion does not suggest that the MME could or should be read as narrowly as JWA urges. Once again, Condition M clearly provides that the MME sublimit

---

[75] JA315 (emphasis added).
[76] Appellant's Br. at 28 (quotations omitted).

applies to "any and all losses" that are part of a causal chain that originates with the accidental discharge of molten material.

### D. *Lesley*'s Coverage Analysis Does Not Apply

The causation analysis set forth by the South Carolina Supreme Court in *Lesley v. Am. Sec. Ins. Co.*, 199 S.E.2d 82 (S.C. 1973) applies only to determine whether coverage applies under an insuring clause,[77] and that standard simply does not apply here because the MME is <u>not</u> an insuring clause. The Policies' insuring clause is contained in section I.A. titled "Perils Insured" and states that "[t]his policy insures against all risks of direct physical loss or damage to Property Insured from perils not otherwise excluded, subject to the terms and conditions of this policy."[78]

---

[77] *Lesley* held that the "fire and lightning" insuring clause in a named peril policy (not an all-risk policy like JWA's) had been triggered when a severe thunderstorm caused a power outage, which caused fans to shut down in a pullet house, causing thousands of chickens to die from excessive heat or suffocation. 199 S.E.2d at 84. Although the nearest efficient cause of the loss (the power outage in *Lesley*) was not covered, a lightning strike was the dominant cause that caused the power outage, thus triggering coverage. *See also King v. North River Ins. Co.*, 297 S.E.2d 637, 638 (S.C. 1982) (named peril (fire) policy; construing clause of inclusion broadly, noting "it is generally sufficient to prove the event insured against was the efficient cause of the loss, even though not the sole cause"). *Jersey Insurance Co. of N.Y. v. Heffron*, 242 F.2d 136 (4th Cir. 1957) (discussed in Appellant's Br. at 38) is just another version of *Lesley*. *Heffron*, which involved a named-peril policy covering loss from an "explosion," held the fact that an alleged explosion in a building near the insured's house was merely "incidental" to the collapse of the building did not preclude recovery for damages to insured's house caused by the explosion. *Id*. at 139 (rejecting insurer's argument that building adjoining house "simply collapsed," and house was damaged by falling building materials; "Every explosion is initiated by some primary event.").

[78] JA266.

Here, *there is no dispute* that JWA's losses are covered because the Molten Material Event caused "direct physical loss or damage to Property Insured." Thus, there is coverage, making *Lesley*'s coverage analysis irrelevant.

The *only* question here is how the "terms and conditions" of the policy—i.e., the MME—apply to sublimit that loss. That question is resolved by reference to Condition M as discussed in Section I.A, *supra*.[79] In short, as the district court correctly noted, if a sub-limited cause (an "event," i.e., heat from molten material) "causes" a loss or series of losses—*wherever* that loss or series of losses falls along the causal chain—then the sublimit applies. That reasoning concludes the necessary causation analysis.

---

[79] The Insurers cited *Lesley* below for the proposition that, as "damage from water used to put out a fire is part of the same loss as the fire itself, . . . [e]lectrical shutdowns are likewise part of the same Occurrence, as shown by the … decision in *Lesley*." (Doc. No. 133 at 42.) Similarly, the Insurers argued, "heat from accidentally discharged molten aluminum caused the Loss at JWA's facility, without any intervening cause." (*Id*. at 43.) Thus, Insurers cited *Lesley* to illustrate how there was a causal connection between the discharge of molten material and the resulting fire and losses to JWA's facility; Insurers, however, did not mean to suggest *Lesley*'s causation test for insuring clauses applied; as the district court recognized, Condition M provides the proper causation standard to apply to JWA's losses.

### 1. This Court Should Reject JWA's Alternate Interpretations Of Condition M

Confusingly, on one hand, JWA argues the word "direct" in the MME "means 'immediate' or 'proximate.'"[80] On the other hand, JWA argues the district court "incorrectly used a proximate cause standard from tort law."[81] In any event, neither argument carries the day.

The first argument ignores Condition M, which must be read in conjunction with the MME.[82] *See supra* § I.A. True, for coverage to be triggered in the first instance, there must be "*direct* physical loss or damage" to insured property. Here, the discharge of molten material caused direct physical loss or damage in the form of fire damage, water damage, damage from falling debris, and damage from a shutdown of utilities. *Sullivan Mgmt., LLC v. Fireman's Fund Ins. Co.*, 879 S.E.2d 742, 744 (S.C. 2022) ("The triggering language for coverage under an all-risks policy—direct physical loss or damage—is the North Star of a property insurance policy. . . . '[D]irect physical loss or damage' contemplates a tangible or material component to loss or damage.") (quotations omitted). From there, Condition M steps in: the MME sublimit "shall apply to *all* losses arising out of any one Occurrence,

---

[80] Appellant's Br. at 28, ("direct" can "reasonably be read to limit the MME's application to the immediate, proximate damage caused by the heat from the molten material discharged").
[81] Appellant's Br. 31 (emphasis omitted).
[82] *See supra* § I.A.

30

*whether such losses include damage to real or personal property, Time Element loss . . ., or both.*"[83] Thus, all losses "caused by" (i.e., "arising out of") the molten material landing on the I-beam are covered—*including* Time Element (e.g., business interruption, ingress/egress) loss, which is not itself "direct physical damage"—subject to the $10 million cap.

As to JWA's second argument, the district court properly applied Condition M's plain and unambiguous causation language, not some kind of "proximate cause" test. (JA7982 ("[T]he $10 million sublimit applies because the loss and series of losses sustained by JWA … arose out of and were ***caused by*** one event: the accidental discharge of molten metal . . . .") (emphasis added).) In its determination, the district court properly adhered to the language of the parties' agreement. "[W]here the parties define the words or terms which they propose using, the contract will be interpreted according to such definitions if free from ambiguity." *C.A.N. Enters., Inc. v. S.C. Health & Human Servs. Fin. Comm'n*, 373 S.E.2d at 587 ("We are without authority to alter a contract by construction or to make new contracts for the parties. Our duty is limited to the interpretation of the contract made by the parties themselves.") (internal citations omitted).

---

[83] JA276 (emphasis added).

## 2. Anti-Concurrent Causation Clauses Are Irrelevant Here

JWA points to anti-concurrent causation language in a Total Terrorism Exclusion in the Policies,[84] but the lack of anti-concurrent causation language in the MME—to clarify the coverage analysis in the event that two concurrent causes cause the same loss—has no bearing on JWA's claim.

First, this is not a case where anti-concurrent causation language might come into play, such as when wind from a storm (a covered peril) damages property while, at the same time, flooding (an excluded peril) damages the same property. It is undisputed that the Molten Material Event set off all JWA's losses. There was no *independent* cause that, combined with the Molten Material Event, caused JWA's losses.[85] *See, e.g.*, *Williams v. Homeowners of Am. Ins. Co.*, 620 F. Supp. 3d 424,

---

[84] Appellant's Br. at 29 ("the Policy excludes loss … directly or indirectly caused by, resulting from, or in connection with any act of terrorism, regardless of any other cause or event contributing concurrently or in any other sequence to the loss" (emphasis & quotations omitted)). Such clauses are "common in the insurance industry," and "clarify an insurer's obligation when multiple causes (e.g., both flood waters and high winds) contribute to the damage underlying a claim. These clauses require insurers to show only that the excluded conduct (like a flood, earthquake, or terrorist attack) contributed to the damage at issue. If an insurer can make this showing, the exclusion applies." *Brown Enters.*, 2022 WL 61424, at *3.

[85] Had there been an independent intervening cause to losses incurred by JWA from the incident on August 4, 2020 (e.g., had an 18-wheeler operated by a drunk driver strikes the facility, causing roof to collapse), an anti-concurrent causation clause (such as that referenced by JWA, Appellant's Br. at 29–30 & 37) may have been relevant in determining whether losses due to that intervening cause were subject to the MME sublimit. But since there was no such independent cause, this is a non-issue.

433 (D.S.C. 2022) (hurricane rainwater accumulates in parking lot; flows into drainage trench running along road, which is intended to funnel water to end of storm ditch, across street and by insured's home; storm drain doesn't work properly, causing water to overflow onto insured's property; anti-concurrent causation clause "is not applicable here. … Williams does not contend that there were any other independent causes of the water damage to his [r]esidence beyond the rainwater that he claims was channeled into his building."); *OTG Mgmt. PHL LLC v. Emps. Ins. Co. of Wausau*, 557 F. Supp. 3d 556, 567–68 (D.N.J. 2021) (no anti-concurrent causation clause; "This does not mean …the Contamination Exclusion is inapplicable simply because some specific event other than the outbreak of COVID-19 was the last in a series of events which lead to the closure of [insured's] businesses. … [N]either the government shutdown or closure orders nor the presence of an infected person on [insured's] premises would have occurred absent the spread of COVID-19.").

Second, Condition M makes clear that any subsequent losses (or series of losses) arising out of (i.e., "caused by") the molten material expulsion are within the MME sublimit.[86] Thus, anti-concurrent causation language in the MME would be

---

[86] JWA states, "[t]he framework articulated in *Lesley* has also been referred to as the 'independent concurrent causation doctrine,'" quoting 43 Am. Jur.2d *Insurance* § 440 (2024). Appellant's Br. at 36. But the quoted section does not mention or cite *Lesley*, nor does the South Carolina Supreme Court use the words "independent concurrent causation" anywhere in the *Lesley* decision.

superfluous. *See Stevens Aviation, Inc. v. DynCorp Int'l LLC*, 756 S.E.2d 148, 152–53 (S.C. 2014) (courts should avoid interpretations that "render[] provisions in the contract meaningless or superfluous").

### E. Missouri's Standard Fire Policy Is Irrelevant To This Loss In South Carolina

The Missouri standard fire policy statute (Mo. Stat. § 379.160(1)) does not apply here because (i) JWA's losses occurred solely at its South Carolina property and (ii) its claims are undisputedly governed by South Carolina law.[87] Thus, the district court correctly "decline[d] to invalidate a non-state specific endorsement based on Missouri law when the question before it is whether the Endorsement applies to property located in South Carolina under South Carolina law, and the application of the Endorsement is not violative of the laws of South Carolina."[88]

JWA's arguments to the contrary fail. First, there is no support for JWA's nonsensical misinterpretation of the Policies' "Special State Requirements" clause,

---

[87] South Carolina has a straightforward statute that governs the law applicable to insurance policies: "All contracts of insurance on property, lives, or interests in this State are considered to be made in the State." S.C. Code § 38-61-10; *see also Sangamo Weston, Inc. v. Nat'l Surety Corp.*, 414 S.E.2d 127, 148 (S.C. 1992) ("all contracts of insurance on property, lives or interest in estate are considered to be made in the state and are subject to laws of the state where policyholder sought "coverage solely for the liability it incurred due to its operations within the State of South Carolina even though the policy was issued outside South Carolina to non-residents of South Carolina and covered property located both inside and outside of South Carolina). *See* Appellant's Br. at 13 n.24.
[88] JA7980.

which states that "[a]ny and all provisions of this policy which are in conflict with the statutes of the State wherein this Policy is applicable are understood, declared, and acknowledged by this Company to be amended to conform to such statutes."[89] It is well-established that this type of clause (also known as a "conformity clause") "does not determine the applicable law." *AEI Life LLC v. Lincoln Benefit Life Co*., 892 F.3d 126, 134–35 (2d Cir. 2018) (collecting cases); *see also, e.g.*, *Com. Union Ins. Co. v. Porter Hayden Co*., 698 A.2d 1167, 1206 (Md. Ct. Spec. App. 1997) ("We are dumbfounded that anyone could read [an agreement to adopt a particular state's law] into that provision. It is clearly nothing more than a standard 'conformity clause' intended simply to ensure that the policy will not be rendered invalid by failing to comply with the laws of the state in which it is issued.").

Second, JWA's argument that the Policies' nuclear radiation, terrorism, and total terrorism exclusions suggest the parties intended for Missouri's Standard Fire Policy to limit the MME's application is a non-starter.[90] It is true the Policies exclude losses caused by "nuclear reaction" with an exception for "direct loss by fire resulting from nuclear reaction or nuclear radiation or radioactive contamination."[91] It is also true that the Policies' terrorism and total terrorism exclusions contain "Standard Fire Policy" carve-outs, which effectively function as conformity

---

[89] JA277.
[90] Appellant's Br. at 45.
[91] JA272.

clauses.[92] These provisions, however, are irrelevant to the proper interpretation of the MME sublimit and do not suggest the Policies intended to carve fire losses out of *each* and *every* exclusion or sublimit under the Policies. Instead, as the district court noted, these provisions actually *confirm* the MME sublimit clearly and unambiguously does *not* carve out fire losses from its $10 million sublimit because "[s]imilar language could have been included in the Molten Material Endorsement or in Condition M with regard to this specific cause of loss, *but it was not*."[93]

Moreover, assuming *arguendo* that Missouri law applied to JWA's claim (which it does not), the Missouri statute, by its plain terms, does not apply to the Policies because it applies only to policies "issued in" Missouri.[94] The Policies here were issued in South Carolina—the location of JWA's principal place of business.[95]

And again, assuming *arguendo* that Missouri law could apply, the Missouri statute also does not void the MME sublimit because the 1943 New York Standard Fire Insurance Policy, which Missouri has adopted as its standard fire insurance policy, provides that the minimum level of coverage that must be provided is the lesser amount of either actual cash value of the property at the time of the loss, reasonable replacement value, or "*an amount not exceeding _____ dollars.*"

---

[92] JA332 & JA333.
[93] JA7981 (emphasis added).
[94] Mo. Stat. § 379.160(1).
[95] JA34 (Compl. ¶ 7).

*Quaker Hills, LLC v. Pac. Indem. Co*., 728 F.3d 171, 179 (2d Cir. 2013) (emphasis added). In other words, Missouri's standard fire policy "allows the owner and the insurer to disregard the property's actual value and agree to have the policy specify instead the amount the insurer will pay the insured in the event that the property is totally destroyed." *Id.* Here, JWA and the Insurers agreed that losses caused by heat from accidentally discharged molten material would be insured up to a sublimit of $10 million. Because there is no inconsistency between the MME sublimit and the Missouri standard fire policy, "there is no justification for the contention that the [MME] is invalid under this statute." *Union Assur. Soc., Ltd., of London, England v. Miller*, 29 F. Supp. 127, 132 (W.D. Mo. 1928) (policy provision not part of policy form fire insurer filed with Superintendent of Insurance contained language of standard policy so "the latter is no sense inconsistent with or nugatory of the former").

Finally, the Missouri statute applies to policies that solely insure losses caused by fire and lightning perils. The Policies at issue here, however, are "All-Risk Policies," which cover "all risks of direct physical loss or damage to Property Insured from perils not otherwise excluded," which includes—but is not limited to—fire losses.[96]

---

[96] JA266.

## II. The MME Does Not Contain A Latent Ambiguity Or Render Coverage Illusory

### A. There Is No Latent Ambiguity

The Policies are unambiguous as applied and contain no latent ambiguity. Moreover, JWA failed to raise its "latent ambiguity" arguments before the district court and has waived them. *Muth*, 1 F.3d at 250.

A latent ambiguity exists when there is no uncertainty arising on the face of the instrument, but one arises when "applied to the object or subject which they described." *Smith v. Coxe*, 191 S.E. 422, 425 (S.C. 1937) (offering an example of a latent ambiguity as a named beneficiary in a will that is unambiguous on the face of the will but creates a latent ambiguity where there are two people with that name); *see also Ward v. Dixie Nat. Life Ins. Co.*, 257 F. App'x 620, 626–27 (4th Cir. 2007) (explaining that a "'latent ambiguity arises when, although the contract is clear 'on its face,' anyone knowing the background would know that it didn't mean what it seems to mean'") (quoting *Stone Container Corp. v. Hartford Steam Boiler Inspection & Ins. Co.*, 165 F.3d 1157, 1162 (7th Cir. 1999)). The Court in *Smith* explained that, in the event a latent ambiguity arises, then the parties are permitted to introduce extrinsic evidence to "enable the reaching of a correct conclusion." 191 S.E. at 426. However, introduction of extrinsic evidence may not be used to create an ambiguity in an otherwise unambiguous policy. *Yarborough*, 225 S.E.2d at 348

(holding that where there was no ambiguity in the policy itself, extrinsic evidence "may not be used to create an ambiguity").

Here, JWA fails to demonstrate any latent ambiguity in the Policies. Instead, JWA merely repackages its (waived) patent ambiguity arguments by once again arguing that the term "event" is ambiguous such that the damages resulting from the undisputed, unbroken sequence of events caused by the accidental release of molten aluminum should be considered *separate* events. As discussed in Section I.A.2 *supra*, JWA's focus on the word "event" is misguided because it is undisputed and unquestionable that the "Occurrence" at issue is the entire chain of "any and all losses" that arose out of the Molten Material Event, and that entire Occurrence is subject to the MME sublimit. An ambiguity may not be created "by pointing out a single sentence or clause" in the contract. *Yarborough*, 225 S.E.2d at 348. Rather, "the contract must be read as a whole, giving appropriate weight to all provisions." *Id.* JWA's interpretation is unreasonable because it would require the Court to ignore the clear and unambiguous terms of Condition M. *See supra* § I.A. Thus, the Policies are unambiguous as applied and contain no latent ambiguity. Moreover, JWA has not identified any uncertainty concerning "the object or subject described" in the Policies, which is required to raise a latent ambiguity. *Smith*, 191 S.E. at 425.

**B.    Extrinsic Evidence Does Not Save JWA's Unreasonable Application Of The MME Sublimit**

Assuming, *arguendo*, the Court considers extrinsic evidence, JWA's proffered extrinsic evidence does nothing to demonstrate a latent ambiguity. Rather, JWA improperly introduces extrinsic evidence in an effort to create a patent ambiguity.

First, JWA fails to demonstrate any latent ambiguity by introducing language in the underwriting guidelines that specifically consider that ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████

In fact, if the Court were to consider the underwriting guidelines (which it should not), ████████████████████████████████████████████

████████████████████████████████, thus triggering the application of MME to the entire chain of loss.[97]

---

[97] JA315. This is *precisely* why the Molten Material Endorsement exists—to limit the potential hazard of molten metal escape and consecutive fire—to $10 million. *See, e.g.*, JA4876-JA4877 (Panas Dep. 83:12-84:4) (Q: Did SCOR's guidelines require you to include the molten material endorsement? A: I believe it speaks to it, that it is recommended that we provide it or that we include it in the policy because it limits our exposure, of course…Q: Do you know why it's recommended that you provide it? A: Well, because it -- like I say, it limits our exposure, and it gets our hands around a real hazardous part of a molten metal account. And a molten metal

Next, JWA's speculation that the Policies could not have intended to limit fire losses caused by molten material discharge at $10 million, given the amount of premiums that JWA has paid, is just JWA's self-serving conjecture and has no support in the record. Similarly, JWA's speculation that the Insurers could not have intended for the MME to apply to JWA's fire losses because they did not immediately raise the application of the MME during the claims-handling process is also baseless and obviously has no bearing on the proper interpretation of clear contractual terms. JWA's speculation clearly does not evince the parties' intent with respect to the application of the MME, and JWA has failed to raise any "latent ambiguity" by reference to its alleged "evidence."

## III.    The "Reasonable Expectations Doctrine" Does Not Apply

The "reasonable expectations doctrine" does not apply here because under South Carolina law, the Court may consider an insured's reasonable expectations only if it first determines the contract is ambiguous.  The insurance contract here is unambiguous. In *Bell v. Progressive Direct Ins. Co.*, South Carolina adopted the "doctrine of reasonable expectations," and in doing so, it reinforced the state's "long history of formalistic interpretation with respect to all contracts," noting in particular "[its] jurisprudence does not support the creation of a substantive right in reasonable

---

account could have escape of molten material, which would cause a fire and burn a place down.· And that's -- could be a really big loss).

expectations." 757 S.E.2d 399, 406 (S.C. 2014). Under the doctrine, for the purpose of interpreting an insurance policy, a court may "look to the reasonable expectations of the insured at the time when he entered into the contract if the terms thereof are ambiguous or conflicting, or if the policy contains a hidden trap or pitfall, or if the fine print takes away that which has been given by the large print." *Id.* at 407 (quoting *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 927 (Del. 1982)). The *Bell* court emphasized that "*the doctrine is not a rule granting substantive rights to an insured when there is no doubt as to the meaning of policy language.*" *Id.* (quoting from *Hallowell*, 443 A.2d at 927) (emphasis in *Bell*).

As discussed in Section I.A *supra*, the MME sublimit is unambiguous and limits coverage to $10 million. District courts have uniformly recognized that where a policy is unambiguous, they cannot alter the policy based on an insured's alleged reasonable expectations.[98] *See, e.g., Kelaher, Connell & Conner, P.C. v. Auto-*

---

[98] One district court suggested an "absurd result" might warrant application of the reasonable expectations doctrine, *see Canopius US Ins., Inc. v. Middleton*, 202 F. Supp. 3d 540 (D.S.C. 2016). However, an absurdity is not listed in *Bell* as a trigger for applying the doctrine, and the doctrine "cannot be used to alter the plain terms of an insurance policy." *Bell*, 757 S.E.2d at 407. Moreover, in *Canopius* "[t]he problem with [the insurer's] analysis is that removing intent from the definition of assault creates an exclusion that swallows up the coverage the Policy purports to provide for claims arising from 'bodily injuries.'" 202 F. Supp. 3d at 550. There were "endless" hypotheticals that would result in "gut[ting] the Policy's initial grant of coverage regarding claims based on bodily injuries," thus the result was absurd because the policy took away all coverage that it purportedly gave. No such absurdity exists here because there is no dispute that JWA is entitled to $10 million

42

*Owners Ins. Co.*, 440 F. Supp. 3d 520, 526 n.4 (D.S.C. 2020) ("Because the Coverage Extension is unambiguous, the court declines to apply the [reasonable expectations] doctrine."); *DHW Purchasing Grp., LLC v. Hub Int'l Midwest Ltd.*, No. 3:19-cv-1243-CMC, 2019 WL 5700457, at *8 (D.S.C. Nov. 4, 2019) (ruling "there is no ambiguity that would have allowed for a reasonable expectation of coverage had Plaintiffs read the Policies"); *Allstate Prop. & Cas. Ins. Co. v. English*, No. 4:16-3404-RBH-KDW, 2017 WL 11297114, at *7 (D.S.C. Nov. 20, 2017) ("[T]his sort of 'expectations' evidence may be considered only if the policy language at issue is ambiguous."). JWA may not create ambiguity simply by stating that it had a different understanding of the policy. *Nationwide Mut. Fire Ins. Co. v. Neetu, Inc.*, No. 3:09-cv-2703-CMC, 2010 WL 3927568 (D.S.C. Oct. 4, 2010) (ruling that the insureds owner's "subjective belief is . . . irrelevant where, as here, a careful review of the policy would have informed him of the exclusion").

Nor is the MME sublimit a "hidden trap or pitfall" or "written in fine print." The MME is contained in its own endorsement, on its own page, and not hidden away, and it is in the same print as other provisions of the policy. In *DHW Purchasing Grp.*, the district court rejected an insured's reasonable expectations argument, finding that "had [insureds] reviewed even the list of endorsements, they would have

---

in coverage, and the parties, all "sophisticated actors," could reasonably have expected to have negotiated the premiums based on this sublimit.

been alerted to the [exclusion]," and "[h]ad they read the listed endorsements, they should have understood that the [exclusion] would preclude coverage for claims." 2019 WL 5700457, at *8. The MME is not a hidden trap or pitfall because it is unambiguous and had JWA and Marsh, its broker, read the sublimit, they would have understood it to apply to this occurrence.

The MME is also not in "fine print" because it is easily capable of being read and is the same size as other policy language. *See New York Life Ins. Co. v. Smith*, 38 S.E.2d 910 (S.C. 1946) (noting a clause was "in very fine print . . . [where] the impression of the stamp is so light that it can be read only with great difficulty"); *Redmond v. Strange*, 26 S.E.2d 16 (S.C. 1943) (referring to words on a document as "fine print" when one required "eyes of microscopic power" in order to read them).

As South Carolina's Supreme Court intended, and as confirmed in the case law applying the doctrine, the reasonable expectations doctrine has "limited application" and is inapplicable here, where the MME sublimit is unambiguous, clearly set forth in the policy, and in regular print. *DHW Purchasing Grp., LLC*, 2019 WL 5700457, at *8. Accordingly, JWA's reasonable expectations argument fails as its last-ditch effort to preclude the application of the MME sublimit or create ambiguity warranting a trial.

**CONCLUSION**

Because it is undisputed that the different types of damage at JWA's facility all arose out of the accidental discharge of molten material on August 4, 2020, the $10 million MME sublimit applies. This Court, therefore, should affirm the district court's judgment below.

**STATEMENT REGARDING ORAL ARGUMENT**

Insurers respectfully state that oral argument is unnecessary in this case. This case presents straightforward issues of contract interpretation that are governed by well-settled state law, and as explained in the district court's thoroughly written order, the underlying facts regarding what occurred during the insured incident at JWA's facility are undisputed.

Respectfully submitted,

Dated: August 2, 2024

DUFFY & YOUNG, LLC
/s/  Brian C. Duffy
    Brian C. Duffy
    Hunter Windham
    96 Broad Street
    Charleston, SC 29401
    (843) 720-2044
    bduffy@duffyandyoung.com

*Counsel for Appellee ACE American*
*Insurance Company, Westport*
*Insurance Corporation, and General*
*Security Indemnity Company of Arizona*

DENTONS US LLP
/s/ Keith Moskowitz
    Keith Moskowitz
    233 S. Wacker Drive, Ste. 5900
    Chicago, IL 60606-6361
    (312) 876-8220
    keith.moskowitz@dentons.com

Catharine Luo
1900 K Street NW
Washington, DC 20006
(202) 496-7500
catharine.luo@dentons.com

Douglas Janicik
2398 East Camelback Road #850
Phoenix, AZ 85016
doug.janicik@dentons.com
(602) 508-3900

*Counsel for Appellee AIG Specialty*
*Insurance Company*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this brief complies with the applicable typeface, type style, and type-volume limitations. This brief was prepared using a proportionally spaced type (Times New Roman, 14-point font). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 10,889 words. This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief.

Dated: August 2, 2024

Respectfully submitted,

/s/ Brian C. Duffy
Brian C. Duffy

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2024, I caused a copy of the Redacted Brief

to be served via ECF on all counsel of record.

<u>/s/ Brian C. Duffy</u>
Brian C. Duffy